AO 91 (REV.5/85) Criminal Complaint                    AUSA Stephen Chahn Lee (312) 353-4127

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**
8-26-13
AUG 2 6 2013

THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES OF AMERICA

v.

DIKE AJIRI and
BANIO KOROMA

**CRIMINAL COMPLAINT**

CASE NUMBER **13 CR 685**

**UNDER SEAL**

**MAGISTRATE JUDGE ROWLAND**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### Count One

Beginning no later than 2007 and continuing until the present, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, DIKE AJIRI, defendant herein:

> did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain money owned by and under the custody and control of Medicare by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items, and services, and, in execution of the scheme, on or about June 26, 2013, did knowingly submit and cause to be submitted a false claim, specifically, a claim that a May 24, 2013 visit by a Mobile Doctors physician with Patient LC was complicated in nature,

in violation of Title 18, United States Code, Section 1347.

### Count Two

On or about June 27, 2012, Chicago, in the Northern District of Illinois, Eastern Division, BANIO KOROMA, defendant herein:

> did knowingly and willfully make a materially false, fictitious, and fraudulent statement and representation in a matter involving a health care benefit program in connection with the payment for home care benefits and services, namely, a statement that Patient SM was confined to her home and required home health services on a Home Health Certification and Plan of Care Form ordering such services for Patient SM from on or about June 13, 2012 through on or about August 11, 2012,

in violation of Title 18, United States Code, Section 1035.

I further state that I am a Special Agent with the Department of Health and Human Services, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

_____
Signature of Complainant
RAUL SESE
Special Agent, Department of Health and Human Services

Sworn to before me and subscribed in my presence,

August 26, 2013 _____     at     Chicago, Illinois _____
Date                                                                              City and State

_____
MARY M. ROWLAND, U.S. Magistrate Judge
Name & Title of Judicial Officer                                          Signature of Judicial Officer

UNITED STATES DISTRICT COURT      )
                                        )     ss

NORTHERN DISTRICT OF ILLINOIS    )

**AFFIDAVIT**

I, Raul Sese, being duly sworn, state as follows:

## I.    **BACKGROUND OF AFFIANT**

1.    I am a Special Agent with the Department of Health and Human Services.   I have been so employed since approximately 2007.

2.    As part of my duties as an HHS Special Agent, I investigate criminal violations relating to white collar crime, including health care fraud.   Through my training and experience, I have become familiar with the methods by which individuals and entities conduct health care fraud and the tools used in the investigation of such violations, including consensual monitoring, surveillance, data analysis, and conducting interviews of witnesses, informants, and others who have knowledge of fraud perpetrated against Medicare.   I have participated in the execution of multiple federal search warrants.   Along with other federal agents, I am responsible for the investigation of the executives, administrators, and physicians associated with the entities doing business as Mobile Doctors.[1]

## II.    **BASIS AND PURPOSE OF AFFIDAVIT**

3.    This affidavit is submitted in part for the limited purpose of establishing probable cause to support a criminal complaint charging that:

    a.    Beginning no later than 2007 and continuing until the present, DIKE AJIRI

---

[1]    In particular, HHS is being assisted in this investigation by Special Agents of the Federal Bureau of Investigation and the Railroad Retirement Board.

did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain money owned by and under the custody and control of Medicare by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items, and services, and, in execution of the scheme, on or about June 26, 2013, did knowingly submit and cause to be submitted a false claim, specifically, a claim that a May 24, 2013 visit by a Mobile Doctors physician with Patient LC was complicated in nature, in violation of Title 18, United States Code, Section 1347.

        b.     On or about June 27, 2012, BANIO KOROMA knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter involving a health care benefit program in connection with the payment for home care benefits and services, namely, a statement that Patient SM was confined to her home and required home health services on a Home Health Certification and Plan of Care Form ordering such services for Patient SM from on or about June 13, 2012 through on or about August 11, 2012, in violation of Title 18, United States Code, Section 1035.

        4.     This affidavit is further submitted in part for the limited purpose of establishing probable cause to support applications for the issuance of warrants to search the offices of Mobile Doctors and In Home Diagnostics in the building located at 3319 N. Elston Avenue, Chicago, Illinois, which I will refer to here as the **Subject Premises** and which is further described in the following paragraphs and in the respective application's Attachment A. As set forth below, there is probable cause to believe that in the **Subject Premises** there exists evidence of (1) violations of the federal health care fraud statute (Title 18, United States Code, Section 1347) in connection with schemes to defraud federal health care benefit programs through the submission of false

2

claims, including those for medically unnecessary services and (2) violations of federal statutes prohibiting false statements relating to health care matters (Title 18, United States Code, Section 1035) in connection with statements relating to patients' qualifications for home health services.

5.     This affidavit is further submitted in part for the limited purpose of establishing probable cause to support applications for warrants to seize certain funds which constitute or are derived from proceeds traceable to the receipt of violations of Title 18, United States Code, Section 1347 and which are maintained in the financial accounts identified in (1) an account at American Chartered Bank in the name of Lake MI Mobile Doctors and ending with the digits 5740 ("**Company Account 5740**"), (2) an account at American Chartered Bank in the name of Mobile Doctors U.S.A., LLC ending in the digits 9296 ("**Company Account 9296**"), and (3) an account at Chase Bank in the name of DIKE AJIRI and his wife ending in the digits 1396 ("**AJIRI Account 1396**"), each of which is described more fully in the respective application and which I will refer to collectively as the "Subject Accounts."

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.  Because this affidavit is being submitted for the limited purposes set forth above, I have not included each and every fact known to me concerning this investigation.   At various places in this affidavit, I have included my interpretations of statements and documents, which are marked with brackets and which are based on my knowledge of the investigation overall as well as my training and experience.

## III.     SUMMARY OF INVESTIGATION

7.     The Department of Health and Human Services, the Federal Bureau of

Investigation, and the Railroad Retirement Board are investigating DIKE AJIRI, BANIO KOROMA, and other individuals associated with Mobile Doctors, a company that sends physicians to conduct home visits with patients at multiple locations around the United States, including Illinois, Michigan, Indiana, Arizona, Texas, and Missouri. As described in detail below, the investigation has revealed that DIKE AJIRI and others have been and are engaged in a scheme to defraud Medicare by submitting and causing to be submitted false claims for patient visits, namely, claims indicating that the visits are more complicated than they actually are. As described in more detail below, the investigation has revealed that Mobile Doctors physicians, including BANIO KOROMA, have been certifying patients as confined to their homes and as requiring home health services when those patients were not confined to their homes, thus enabling home health agencies to submit claims to Medicare for services rendered to patients that did not actually qualify for such services.

8.     Among other things, and as described more below, agents and law enforcement officials have interviewed more than 25 former employees of Mobile Doctors, including Individual JP and Individual MH, who separately reported Mobile Doctors' fraudulent billing practices to Medicare prior to being contacted by law enforcement. Agents and law enforcement officials have also interviewed several current employees who reported Mobile Doctors' fraudulent billing practices to law enforcement and provided documents to law enforcement, all prior to being contacted by law enforcement. Based on checks of criminal-history databases, none of the individuals who have been interviewed and whose statements are described below have any felony convictions or any convictions involving false statements or dishonesty. The government is not aware of any financial interest that Individual

4

JP, Individual MH and certain other former employees have in the investigation.

9.      Agents and law enforcement officials have also reviewed emails and documents that were provided by former Mobile Doctors employees as well as emails that were obtained via a search warrant from an email account used by AJIRI, specifically, mobiledoctors@yahoo.com.

10.     Agents and law enforcement officials have also reviewed and analyzed claims data from Cahaba Safeguard Administrators, a contractor which works to protect the integrity of the Medicare program, including data for two entities that Mobile Doctors has used to submit claims to Medicare, specifically, Lake MI Mobile Doctors and Doctor Housecalls of MI, covering the period from 2006 through March 2013.   Agents and law enforcement officials have also reviewed and analyzed claims data from Palmetto, a contractor that processes medical claims for Railroad Retirement Board beneficiaries, and claims data that was downloaded from a the Services Tracking, Analysis, and Reporting System database, which is maintained by the Centers for Medicare and Medicaid Services.

11.     Agents and law enforcement officials have also reviewed patient files that were obtained via an audit in 2011 as well as from a search of a home health agency that provides services to some Mobile Doctors patients.   Agents also have interviewed patients and primary-care physicians of Mobile Doctors patients.

## IV.     **MEDICARE BACKGROUND INFORMATION**

12.     Medicare is a health care benefit program within the meaning of 18 U.S.C. § 24(b). Medicare provides free or below-cost healthcare benefits to certain eligible beneficiaries, primarily persons sixty-five years of age or older.   Individuals who receive Medicare benefits are often referred to as Medicare beneficiaries.

13.     Medicare consists of four distinct parts: Part A provides hospital insurance with coverage for inpatient hospital services, skilled nursing care, and home health and hospice care; Part B provides supplementary medical insurance for physician services, outpatient services, and certain home health and preventive services; Part C is a private plan option for beneficiaries that covers all Part A and B services, except hospice; and Part D covers prescription drug benefits.

14.     Centers for Medicare and Medicaid Services, a federal agency within the United States Department of Health and Human Services, administers the Medicare program.  CMS contracts with public and private organizations, usually health insurance carriers, to process Medicare claims and perform administrative functions.  Centers for Medicare and Medicaid Services currently contracts with Wisconsin Physicians Service to administer and pay Part B claims from the Medicare Trust Fund.   The Medicare Trust Fund is a reserve of monies provided by the federal government. Wisconsin Physicians Service processes Medicare Part B claims submitted for physicians' services for beneficiaries in multiple states including Illinois, Indiana and Michigan.

15.     In order to promote the integrity of the Medicare program, CMS contracts with Zone Program Integrity Contractors, such as Cahaba Safeguard Administrators, to concentrate on, among other things, fraud and abuse detection and deterrence in order to protect the Medicare Trust Fund.   During a portion of this investigation, Centers for Medicare and Medicaid Services contracted with Cahaba Safeguard Administrators for multiple states including Illinois, Michigan and Indiana.   Centers for Medicare and Medicaid Services previously contracted with and TrustSolutions, a program service contractor that also

6

concentrated on, among other things, fraud and abuse detection and deterrence, and conducted a 2011 audit referenced below.

16.     Enrolled providers of medical services to Medicare recipients are eligible for reimbursement for covered medical services.   By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing reimbursement, and to keep and allow access to records and information as required by Medicare.

17.     Providers of health care services to Medicare beneficiaries seeking reimbursement under the program must submit a claim form, which is a "CMS 1500," with certain information regarding the Medicare beneficiary, including the beneficiary's name, health insurance claim number, date the service was rendered, location where the service was rendered, type of services provided, number of services rendered, the procedure code (described further below), a diagnosis code (known as an "ICD-9 code"), charges for each service provided, the provider's unique identifier (known as a Provider Transaction Access Number), and a certification that such services were personally rendered by that provider.

18.     The American Medical Association has established certain codes to identify medical services and procedures performed by physicians, which are collectively known as the Physicians' Current Procedural Terminology system.   The CPT system provides a national correct coding practice for reporting services performed by physicians and for payment of Medicare claims.   CPT codes are widely used and accepted by health care providers and insurers, including Medicare and other health care benefit programs.

19.     The American Medical Association has established CPT codes for home visits with new and established patients.   Since 1998, home visits with new patients are billed using

7

CPT codes 99341 through 99345, and home visits with established patients are billed using CPT codes 99347 through 99350. Higher CPT codes within the 99341-99345 range and the 99347-99350 range indicate visits of a more complicated nature.

20. Specifically, according to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, a home visit with an established patient is billed based on three key components: (1) the extent of the patient history that the physician takes during the visit, (2) the extent of the examination performed by the physician during the visit, and (3) the medical decision making done by the physician, which refers to the "complexity of establishing a diagnosis and/or selecting a management option."

21. According to the CPT manuals, medical decision making is measured by: (1) "the number of possible diagnoses and/or the number of management options that must be considered," (2) "the amount and/or complexity of medical records, diagnostic tests, and/or other information that must be obtained, reviewed, and analyze," and (3) "the risk of significant complications, morbidity, and/or mortality, as well as comorbidities, associated with the patient's presenting problems(s) (sic), the diagnostic procedure(s), and/or the possible management options." The table below is from the Centers for Medicare and Medicaid Services' Evaluation and Management Services Guide, and summarizes what is involved with each kind of medical decision making.

| TYPE OF DECISION MAKING | NUMBER OF DIAGNOSES OR MANAGEMENT OPTIONS | AMOUNT AND/ OR COMPLEXITY OF DATA TO BE REVIEWED | RISK OF SIGNIFICANT COMPLICATIONS, MORBIDITY, AND/OR MORTALITY |
|---|---|---|---|
| Straightforward | Minimal | Minimal or None | Minimal |
| Low Complexity | Limited | Limited | Low |
| Moderate Complexity | Multiple | Moderate | Moderate |
| High Complexity | Extensive | Extensive | High |

22.     According to the American Medical Association's annual Current Procedural Terminology manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99347, it must have at least two of the following key components:

- A problem focused interval history, which covers the "chief complaint; brief history of present illness or problem"

- A problem focused examination, which is a "limited examination of the affected body or organ system"

- Straightforward medical decision making

23.     According to the CPT manuals, a home visit that qualifies for CPT code 99347 "usually" involves a problem or problems that are "self limited or minor," which is defined as a "problem that runs a definite and prescribed course, is transient in nature, is not likely to permanently alter health status OR has a good prognosis with management/compliance." According to the manuals, "Physicians typically spend 15 minutes face-to-face with the patient and/or family."

24.     According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99348, it must have at least two of the following

9

key components:

- An expanded problem focused interval history, which covers the "chief complaint; brief history of present illness; problem pertinent system review"

- An expanded problem focused examination, which is a "limited examination of the affected body area or organ system and other symptomatic or related organ system(s)"

- Medical decision making of low complexity

25. According to the CPT manuals, a home visit that qualifies for CPT code 99348 "usually" involves a problem or problems that are "of low to moderate severity." According to the CPT manuals, a problem of "low severity" is one "where the risk of morbidity without treatment is low; there is little to no risk of mortality without treatment; full recovery without functional impairment is expected." According to the CPT manuals, a problem of "moderate" severity is one "where the risk of morbidity without treatment is moderate; there is a moderate risk of mortality without treatment; uncertain prognosis OR increased probability of prolonged functional impairment." According to the manuals, "Physicians typically spend 25 minutes face-to-face with the patient and/or family."

26. According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT 99349, it must have at least two of the following key components:

- A detailed interval history, which covers the "chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; pertinent past, family, and/or social history directly related to the patient's problems"

- A detailed examination, which is an "extended examination of the affected body area(s) and other symptomatic or related organ systems(s)"

10

- Medical decision making of moderate complexity

27. According to the CPT manuals, a home visit that qualifies for CPT code 99349 "usually" involves a problem or problems of "moderate to high severity." According to the CPT manuals, a problem of "high" severity is one where "the risk of morbidity without treatment is high to extreme; there is a moderate to high risk of morbidity without treatment OR high probability of severe, prolonged functional impairment." According to the manuals, "Physicians typically spend 40 minutes face-to-face with the patient and/or family."

28. According to the CPT manuals, since 1998, for a home visit with an established patient to be billed properly under CPT code 99350, it must have two of the following key components:

- A comprehensive interval history, which covers the "chief complaint; extended history of present illness; review of systems that is directly related to the problem(s) identified in the history of the present illness plus a review of all additional body systems; **complete** past, family and social history" (bold in original)

- A comprehensive examination, which is defined as a "general multisystem examination or a complete examination of a single organ system"

- Medical decision making of moderate to high complexity

29. According to the AMA's CPT manual, a home visit that qualifies for CPT code 99350 "usually" involves a problem or problems of "moderate to high severity." According to the manuals, "The patient may be unstable or may have developed a significant new problem requiring immediate physician attention. Physicians typically spend 60 minutes face-to-face with the patient and/or family."

30. The Centers for Medicare and Medicaid Services' Evaluation and Management

11

Services Guide, which includes documentation guidelines from 1995 and 1997, provides further guidance on what is involved for each of the types of histories referenced in the CPT manuals. The following table is taken from the Evaluation and Management Services Guide and summarizes what is involved for each type of history:

| TYPE OF HISTORY | CHIEF COMPLAINT | HISTORY OF PRESENT ILLNESS | REVIEW OF SYSTEMS | PAST, FAMILY, AND/OR SOCIAL HISTORY |
|---|---|---|---|---|
| Problem Focused | Required | Brief | N/A | N/A |
| Expanded Problem Focused | Required | Brief | Problem Pertinent | N/A |
| Detailed | Required | Extended | Extended | Pertinent |
| Comprehensive | Required | Extended | Complete | Complete |

31.     According to the Centers for Medicare and Medicaid Services' Medicare Claims Processing Manual, Chapter 12; "[m]edical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted."

32.     In addition, the Medicare Claims Processing Manual states as follows regarding a comprehensive history, which is one of the key components for billing a home visit with an established-patient using CPT code 99350:

> The comprehensive history must include a review of all the systems and a complete past (medical and surgical) family and social history obtained at that visit. In the case of an established patient, it is acceptable for a physician to review the existing record and update it to reflect only changes in the patient's medical, family, and social history from the last encounter, but the physician must review the entire history for it to be considered a comprehensive history.

12

33.     Medicare payments on claims under CPT codes 99347 and 99348 generally are less than the payments on claims under CPT codes 99349 and 99350.   The table below summarizes the requirements and typical characteristics of established-patient visits that are correctly billed using CPT codes 99347 through 99350, along with the approximate fees paid for such visits in the Chicago area in both 2009 and 2013.

| CPT code | Interval history or examination | Medical decision making | Typical problem | Typical amount of time | Approximate fees for Chicago (2009 / 13) |
|---|---|---|---|---|---|
| 99347 | Problem focused | Straightforward | Self limited or minor | 15 minutes | $56.13 / $58.94 |
| 99348 | Expanded problem focused | Low | Low to moderate severity | 25 minutes | $84.46 / $88.91 |
| 99349 | Detailed | Moderate complexity | Moderate to high severity | 40 minutes | $122.82 / $134.45 |
| 99350 | Comprehensive | Moderate to high complexity | Unstable patient or significant new problem requiring immediate physician | 60 minutes | $171.25 / $187.70 |

34.     Medicare Part A, Hospital Insurance Benefits for the Aged and Disabled, governs reimbursement for home health care.   Medicare authorizes reimbursement for home health care only if the care was actually provided and was medically necessary.   Medicare reimbursement is not authorized for services and treatment that were not actually provided or for which a patient did not meet the criteria necessary to justify the claimed service or treatment.   For a patient to receive home health services from a home health agency, Medicare requires certification by a physician of the patient's need:   the patient must be confined to his or her home, the services must be medically necessary, the patient must need skilled medical services, the patient must be under the care of a

13

physician, and a physician must certify that the patient meets these requirements. These services are certified and billed for in 60-day increments known as "episodes." Each episode requires its own certification. To certify a patient, a physician must sign a form entitled, "Home Health Certification and Plan of Care," which is sometimes referred to as a "Form 485."

35. Title 42, United States Code, Section 1395nn, sometimes referred to as the Stark Act, generally prohibits a physician from making referrals for certain services payable by Medicare to an entity with which the physician or a family member has a financial relationship.

36. Medicare regulations require providers to maintain complete and accurate medical records documenting each patient's need for the specific services provided to each patient. Records that Medicare requires to be maintained for physician services include patient histories, treatment notes, patient sign-in registries, physician orders, plan of care and certifications, admission and discharge records, prescriptions and notes for drugs or other medical supplies, and medical tests orders and results. Medicare requires these records are to be kept for up to seven years by the Medicare provider. These records are located at Mobile Doctors' various offices, including the **Subject Premises**.

## V.    **MOBILE DOCTORS BACKGROUND**

37. According to the Mobile Doctors' website, www.mobiledoctors.com (last visited on August 26, 2013), Mobile Doctors is a "company specializing in consulting and management of physician practices who make house calls. Our associated physicians have made over 500,000 house calls since its inception." According to the website, Mobile Doctors has branches in Illinois, Indiana, Michigan, Texas, Arizona, and Missouri.

38. According to interviews with several physicians who worked with Mobile Doctors,

14

Mobile Doctors arranged for patient home visits by contracting with physicians who performed the visits. Under the contracts, physicians assigned their rights to bill and to collect payment to Mobile Doctors, in return for payment from Mobile Doctors.

39. According to interviews with multiple former and current employees, Mobile Doctors operates by sending physician and medical assistants to patients' homes to conduct evaluation and management visits. The medical assistant drives the physician and keeps track on a mileage log of mileage and the time the physician arrives at each patient's home. During a visit, the physician fills out a medical chart and a routing slip, or router. The routing slip includes a section designating how the visit should be billed to Medicare, specifically, which of several CPT codes should be used.

40. According to a July 2013 organizational chart provided by current employees who recently approached law enforcement on their own, DIKE AJIRI is the CEO of Mobile Doctors. According to interviews with current and former employees, AJIRI has been the head of Mobile Doctors for more than 10 years. According to interviews with former employees, one of AJIRI's duties in the period before 2009 was to review routing slips before the billing department used them to submit claims to Medicare.

41. According to the July 2013 organizational chart, Individual TC is the director of quality assurance for Mobile Doctors. According to interviews with current and former employees, Individual TC's current duties include reviewing routing slips before the billing department uses them to submit claims to Medicare.

42. According to interviews with multiple former and current employees, BANIO KOROMA is one of several physicians who work for Mobile Doctors. According to claims data,

15

Mobile Doctors has billed more patient visits for KOROMA than any other physician in the period from 2006 through March 2013, billing approximately 17,439 patient visits for KOROMA from August 2007 onwards. According to claims data, Mobile Doctors also has billed more certifications of patients as confined to their homes and as requiring home health services for KOROMA than any other doctor in the same period, billing approximately 6,057 such certifications for KOROMA.

43. According to the Mobile Doctors website, the company's corporate headquarters and its Chicago office are located at 3319 N. Elston Avenue, Chicago, Illinois (the "**Subject Premises**"). According to the Mobile Doctors website, Mobile Doctors has branch offices in multiple states, including Illinois, Michigan, Indiana, Arizona and Texas.

44. According to current and former employees, the second floor of the **Subject Premises** contains Mobile Doctors' corporate offices, including the offices of AJIRI, Individual TC, and various directors who oversee the company's entire operations, rather than specific branches. The first floor of the **Subject Premises** contains the offices of Mobile Doctors' Chicago branch, as well as the offices for Mobile Doctors' billing department, which handles billing for all of Mobile Doctors' offices.

45. According to interviews with multiple former and current employees, Mobile Doctors physicians do not perform tests such as echocardiograms, also called ultrasounds, but do order that such tests be performed. In particular, echocardiograms are done on Mobile Doctors patients by employees of In Home Diagnostics, dba Ultrasound2You. According to Medicare enrollment documents, In Home Diagnostics, dba Ultrasound2You, is a company that provides portable x-rays in patients' homes, doctors' offices, or nursing homes. According to Medicare

16

enrollment documents and the Illinois Secretary of State's records, In Home Diagnostics' office is in the same building as Mobile Doctors' Chicago office, which is located at the **Subject Premises**. As discussed below, although the tests are done by employees of In Home Diagnostics, Mobile Doctors bills the echocardiograms so that they appear to have been done by Mobile Doctors' physicians.

46.     According to a review of the Illinois Department of Financial and Professional Regulation's public database, AJIRI and Individual TC are not licensed physicians in the State of Illinois.

47.     According to a review of bank and corporate records, Mobile Doctors uses multiple entities and bank accounts. According to a bank report reviewing Mobile Doctors' operations in connection with Mobile Doctors' application for a loan, Mobile Doctors uses Lake MI Mobile Doctors, Inc. "handles all the billing" for Mobile Doctors' branches and previously used Doctor Housecalls of MI to handle the billing for northwest Indiana. Based on bank records and the EFT agreement between Medicare and Lake MI Mobile Doctors, payments are made by Medicare into an account at American Chartered Bank in the name of Lake MI Mobile Doctors and ending with the digits 5740 ("**Company Account 5740**"). According to bank records, funds are regularly transferred from the 5740 account to another account at American Chartered Bank in the name of Mobile Doctors U.S.A., LLC ending in the digits 9296 ("**Company Account 9296**").

48.     According to a personal financial statement that AJIRI signed on December 31, 2012, he receives $1.5 million in annual partnership income, and this interest is identified as "Mobile Doctors LLC," which he said he has owned "since 1996." According to an October

17

2011 operating agreement for "Mobile Doctors USA, LLC", AJIRI owns 98 percent of Mobile Doctors USA and his mother owns the remaining two percent. According to the bank report, "Mobile Doctors USA" was formed in June 2011 and was formed as a result of an asset transfer from Mobile Doctors Management to Mobile Doctors USA. According to a March 2011 partnership for Mobile Doctors Management, AJIRI's father owned 99 percent of the interest in Mobile Doctors Management, and AJIRI bore 100 percent of the costs, had 93 percent of the net profits, and was responsible for determining profit allocation.

49. According to a review of bank records, approximately $4,365,102.65 was transferred from Mobile Doctors to a Chase Bank account in the name of AJIRI and his wife ("**AJIRI Account 1396**") from 2008 to January 2013.

## V.      UPCODING OF PATIENT VISITS

### A. Patient Visits Are Billed to Medicare at Inflated Levels

50. Mobile Doctors submitted claims to Medicare seeking payment for established-patient visits while falsely claiming that the visits were more complicated and longer than they actually were. In particular, Mobile Doctors claimed that visits with established patients were properly billed using CPT codes 99349 and 99350, when those visits were not as complicated and/or lengthy as required to properly qualify for such codes.

51. According to interviews with more than seven former and current physicians working with Mobile Doctors, former Mobile Doctors branch managers, former clinical coordinators, several current employees, and several patients, the typical visit that a Mobile Doctors physician has with an established patient is approximately 10 to 30 minutes in duration and is routine in nature.

18

52.     For example, Physician MT, who worked for Mobile Doctors from 2007 through 2009, said that he performed patient visits that were typically 20 minutes long and did not usually require complicated medical decisions because the patients' conditions rarely changed. Physician MT said that he did not believe that his patients needed to be seen once a month, but Mobile Doctors' policy was to require physicians to see patients monthly.   Physician MT said that he marked the billing codes on routing slips himself, and that he marked the highest level for visits with only one of his patients, Patient PO.   However, according to the claims data, approximately 98.6 percent of his established-patient visits were billed under CPT codes 99349 and 99350, and approximately 51 percent of the approximately 467 patients that Physician MT treated while working with Mobile Doctors had at least one established-patient visit billed under CPT code 99350.

53.     Physician JD, who worked for Mobile Doctors out of its Chicago office in 2010 and 2011, said that most of the time she visited a patient, that patient presented no new medical issues.   Physician JD also said that she knew that some of the patients also had primary care physicians who were monitoring their conditions, so she viewed her role as helping those physicians monitor the patients, rather than being the primary care physician herself.   Physician JD said that the medical assistant who accompanied her on a visit marked the billing code on the routing slips, and that she understood that it was based on how long the visit was.   Physician JD said that 80 percent of her visits were 15 minutes long, and she did not recall spending 40 minutes or more with any patient.   According to the claims data, however, approximately 99.9 percent of her approximately 1,216 established-patient visits were billed under CPT codes 99349 and 99350.

54.     Physician BG11, who worked for Mobile Doctors in 2012, said that a lot of the patients that he saw were not that sick.  He said that he did not mark the billing codes on the routing slips but understood that someone at the Mobile Doctors office did this.  He said that about a third of the patients he saw were ambulatory and that his visits with them were 10 to 15 minutes long and only involved seeing how things had changed since his prior visit.  He said that only about five percent of his patients had medical problems of a moderate or complex nature.  According to the claims data, however, approximately 99.85 percent of his approximately 656 patient visits were billed under CPT codes 99349 and 99350.

55.     Physician BG1 recalled one specific patient, Patient JC, who was fully ambulatory and who helped take care of another patient who lived in the same building.  Physician BG1 said that his visits with Patient JC required no medical decision making.  However, according to claims data, four Mobile Doctors physicians, including KOROMA and Physician BG1, made approximately 64 established-patient visits with Patient JC from August 2008 through August 2012, all under CPT codes 99349 or 99350, with approximately 92 percent billed under CPT code 99350.

56.     Similarly, patients of Mobile Doctors physicians have described the visits as about 10 to 30 minutes in length and as routine in nature.

57.     For example, Patient JC said that the visits by Mobile Doctors physicians were about 15 to 20 minutes long.  With regards to KOROMA, Patient JC said that he did not do much during the visits and that his assistant did most of the work.  She said that she was not surprised to be contacted by law enforcement because she had reviewed the Explanation of Benefits forms that she receives from Medicare, and she thought Mobile Doctors' payments were high for such short

visits.

58.     Patient WG1 said that he gets a visit from Physician BB approximately every two weeks.  Patient WG1 said that the visits are 10 to 15 minutes in length.  According to Patient WG1, Physician BB checks his vital signs and blood pressure, and has Patient WG1 stand up and move around.  By contrast, according to claims data, Mobile Doctors billed approximately 44 established-patient visits for Patient WG1 from February 2009 through December 2012, all under CPT codes 99349 or 99350, with approximately half billed under CPT code 99350.

59.     Patient SM said that her visits with her physician, KOROMA, are 20 to 30 minutes in length.  According to Patient SM, during those visits, KOROMA checks her vitals, follows up on her prescriptions, and checks her legs.  By contrast, according to claims data, Mobile Docotrs billed approximately 48 established-patient visits for Patient SM from April 2008 through February 2017, all under CPT codes 99349 or 99350, with approximately 96 percent billed using CPT code 99349.

60.     Patient CM said that his visits with Mobile Doctors physicians are and have been approximately 20 minutes in length and routine in nature.  According to claims data, three Mobile Doctors physicians have visited Patient CM approximately 17 times from May 2011 through September 2012, and Mobile Doctors billed every visit using CPT code 99350.

61.     People who worked in Mobile Doctors' offices also said that visits were typically short and routine in nature, based on their knowledge of physicians' schedules and on their accompanying physicians on patient visits during their training.  According to Individual LH, who was a clinical coordinator and then director of clinical coordinators for the Chicago branch from late 2011 through July 2013, when she was terminated, visits were routine and short in

duration in part because physicians typically saw 15 to 17 patients a day, and thus could not spend long with a particular patient. Individual LH said that the times that a physician spent at a patient's house was tracked on daily routing schedules, and that those showed that patient visits were short in duration.

62.     In contrast to how physicians, patients, and other employees have described typical Mobile Doctors visits, according to claims data, and as shown in the graph below, from 2006 through February 2013, approximately 99 percent of all established-patient visits by physicians who work with Mobile Doctors were coded using CPT codes 99349 and 99350, as if the visits involved medical decision making of moderate to high complexity, detailed or comprehensive interval histories or medical examinations, and/or visits that were typically more than 40 minutes long.



63.     In addition, the following table shows how established-patient visits were billed

for the 25 Mobile Doctors physicians who had the greatest number of established-patient visits between 2006 and March 2013.

| Physician | Office | CPT 99347 | CPT 99348 | CPT 99349 | CPT 99350 | CPT 99349-50 % total | CPT 99350 % total |
|-----------|--------|-----------|-----------|-----------|-----------|----------------------|-------------------|
| KOROMA | Chicago | 0 | 15 | 10,320 | 7,104 | 99.91% | 40.74% |
| DF | Chicago | 0 | 40 | 11,140 | 2,398 | 99.71% | 17.66% |
| RM | Chicago | 2 | 34 | 6,664 | 5,791 | 99.71% | 46.36% |
| AN | Chicago | 0 | 4 | 10,026 | 2,359 | 99.97% | 19.04% |
| BB | Chicago | 0 | 7 | 7,799 | 2,097 | 99.93% | 21.18% |
| HG | Detroit | 1 | 8 | 5,539 | 1,922 | 99.88% | 25.73% |
| AR | Chicago | 0 | 8 | 5,206 | 2,237 | 99.89% | 30.02% |
| WF | Detroit | 0 | 9 | 5,749 | 1,674 | 99.88% | 22.52% |
| AR | Detroit | 0 | 15 | 5,202 | 1,733 | 99.78% | 24.94% |
| TS | Chicago | 0 | 2 | 4,297 | 2,401 | 99.97% | 35.84% |
| CH | Detroit | 0 | 1 | 4,397 | 1,759 | 99.98% | 28.57% |
| JA | Chicago | 1 | 2 | 4,053 | 1,754 | 99.95% | 30.19% |
| MT | Chicago | 1 | 70 | 3,860 | 1,183 | 98.61% | 23.13% |
| RP | Indianapolis | 5 | 5 | 1,013 | 3,874 | 99.80% | 79.11% |
| KH | Detroit | 0 | 3 | 3,130 | 1,341 | 99.93% | 29.97% |
| AK | Detroit | 0 | 0 | 3,677 | 736 | 100.00% | 16.68% |
| BG2 | Detroit | 0 | 0 | 3,086 | 1,080 | 100.00% | 25.92% |
| LZ | Chicago | 0 | 1 | 3,016 | 1,077 | 99.98% | 26.31% |
| JM | Chicago | 0 | 1 | 3,235 | 823 | 99.98% | 20.28% |
| NJ | Chicago | 0 | 3 | 2,776 | 1,017 | 99.92% | 26.79% |
| SM | Chicago | 0 | 0 | 2,976 | 815 | 100.00% | 21.50% |
| AA | Chicago | 0 | 1 | 2,707 | 882 | 99.97% | 24.57% |
| LV | Detroit | 0 | 16 | 2,600 | 841 | 99.54% | 24.33% |
| SM | Detroit | 0 | 0 | 2,513 | 932 | 100.00% | 27.05% |
| NJ | Chicago | 0 | 1 | 2,247 | 817 | 99.97% | 26.66% |

## B. Mobile Doctors Procedure for Billing Patient Visits

64. According to interviews with multiple former and current employees, including Individual LH, Mobile Doctors uses a form called a "routing slip" or "router" for each patient visit.

23

According to interviews, some physicians such as Physician MT used to mark the billing code for each visit on the routing slip, but clinical coordinators now handle this for the physicians.

65.    According to Individual LV, who is the current manager of a branch office, clinical coordinators currently are responsible for marking the billing code for patient visits. According to Individual LV, the default code is the second-highest on the routing slip, which is defined on the routing slip as "99349 EP home visit mod," and which is sometimes referred to as a "Level 3" visit. The relevant section of a blank routing slip is shown below:

| HOME VISITS | |
|---|---|
| ____ 99350 EP HOME VISIT HIGH | ____ 99345 NP HOME VISIT HIGH |
| ____ 99349 EP HOME VISIT MOD | ____ 99344 NP HOME VISIT MOD |
| ____ 99348 EP HOME VISIT MOD | ____ 99343 NP HOME VISIT MOD |
| ____ 99347 EP HOME VISIT LOW | ____ 99342 NP HOME VISIT LOW |
| | ____ 99341 NP HOME VISIT LOW |

66.    According to Individual LH, who began working as a clinical coordinator in 2011 and was director of clinical coordinators in the Chicago branch office from late 2011 through July 2013, when she was terminated, clinical coordinators are taught to mark established-patient visits as a "Level 4" visit if certain criteria are met. According to Individual LH, some of those factors include if a patient's blood pressure was above 180/110, if their blood sugar was above 400 or below 50, if a patient's pulse oxygen was less than 90 percent, if a visit was longer than 60 minutes in duration, or if the physician referred the patient during the visit to an emergency room, hospice or nursing home.

67.    Individual LH also provided law enforcement agents with a Powerpoint presentation that she said is used for training. The Powerpoint, which is entitled "a Powerpoint

24

presentation entitled "Clinical Coordinator Orientation," and which was last modified in June

2013, states as follows regarding established-patient visits:

> Visits are graded based on the time of services performed, as well as the complexity of the visit.

> Most **EP visits** [established patient visits] are a level 3 [CPT code 99349]

> Visits may be up-coded to level 4 [CPT code 99350] based on time and/or complexity.

68.     The Powerpoint presentation also states regarding the use of CPT code 99350:

> EP visits should be upcoded from a "3" to a "4" if any of the following occur:

> - Poses a threat to life or bodily function.
> - The visit lasted longer than 60 minutes.
> - Blood Pressure above 180/110 (if either number is elevated, an upcode should occur).
> - Blood Sugar above 400 or below 50.
> - Pulse Ox reading of 90 or below.
> - The patient is advised to go to the ER (even if the patient decides not to go, the visit should be upcoded).
> - The patient is referred to Hospice or a Nursing Home.

69.     According to Individual LH, visits were rarely coded using the two lowest levels

(CPT codes 99347 and 99348).   According to Individual LH, INDIVIDUAL TC told her that a

visit should be coded at level 2 (CPT code 99348) if the patient terminated the visit before the

physician could finish it.   She recalled this happening less than 10 times in approximately two

years.

70.     According to former and current employees, the routing slips consist of a white

page along with a yellow carbon copy.   The white page stays with the patient's file, and the

yellow carbon copy is reviewed before being sent to Mobile Doctors' billing department, which is

located on the first floor of the **Subject Premises**.   Former employees in Mobile Doctors' branch offices, such as Individual AT, said that yellow copies are sent to Chicago for review and that all billing for the branch offices is handled by Mobile Doctors' billing department.

71.     According to Individual JP and Individual MH, prior to 2009, AJIRI reviewed the yellow copies himself before they were sent to billing.   According to Individual JP and other former employees, Individual JP also reviewed yellow copies in and around 2009 and 2010 before Individual JP was terminated.   According to former and current employees, Individual TC replaced Individual JP as director of quality assurance and currently reviews the yellow copies.

### C.  AJIRI's Knowledge Regarding CPT Codes

72.     Individual MH is a former employee who worked for Mobile Doctors for approximately 10 years and was the manager of the Chicago branch office under AJIRI prior to being terminated in or around 2008.   According to Individual MH, AJIRI was knowledgeable about Medicare and attended seminars on Medicare, and oversaw billing during her time with the company.[2]

73.     In addition, based on emails obtained via search warrant, in 2007, AJIRI was part of an email group that received advice from a physician in another state about how to code home visits, including advice on CPT codes 99347, 99348, 99349 and 99350, as well as advice on how to avoid Medicare scrutiny.   In particular, AJIRI received two versions of a memo by Physician TK, who worked in a state on the East Coast, one in June 2007 and another in July 2007.

---

[2]       As noted in paragraph 8, before being contacted by law enforcement, Individual MH contacted Medicare in the spring of 2011 and reported that Mobile Doctors was engaging in upcoding.   The government is not aware of any financial interest of Individual MH in the government's investigation.

74.     In both versions of the memo, Physician TK discussed each of the CPT codes by quoting the CPT manuals and providing additional commentary:

☐ **Self-limited or minor:  99347 A problem that runs a definite and prescribed course, is transient in nature, and is *not likely to permanently alter health status* or has a good prognosis with management/compliance.  ...**

☐ **Low severity: 99348  problem where the *risk of <u>morbidity</u> without treatment is LOW* there is *LITTLE TO NO risk of <u>mortality</u> without treatment*; <u>full recovery functional</u> impairment is expected without treatment.  ...**

☐ **Moderate severity: 99349A problem where the *risk of morbidity without treatment is moderate*; there is moderate risk of mortality without treatment; *uncertain prognosis or increased probability of prolonged functional impairment.*  ...**

☐ **High severity: 99350  A problem where *the risk of morbidity without treatment is high to extreme*; there is a *moderate to high risk of mortality without treatment* <u>OR</u> *high probability of severe, prolonged functional impairment.***

(formatting as in original)

75.     For example, in both versions of the memo, Physician TK wrote that visits using CPT code 99348 are "straightforward."  In the June 2007 version, he commented that "if the patient can get better without your [the physician's] services you should be billing 99348."  In the June 2007 version, he also advised physicians to rely on their professional opinions and commented, "[O]ne of the easiest ways to catch fraud crooks is that they foolishly bill everything the same."

76.     The June 2007 version of the memo also attributes a comment to AJIRI, which shows AJIRI's familiarity with CPT codes and the differences between them.  In a section discussing the risks associated with CPT code 99350, the memo states:

27

> Dike Ajiri interestingly points out that this differs from the highest office code where the criteria is" (sic) high risk", not "moderate to high risk" as is for our 99350 making it easier for us to bill this complex list.

77.     In particular, this comment "point[ed] out" by AJIRI shows AJIRI's familiarity with the elements of CPT code 99350, the elements of the highest level for office visits (CPT code 99215), and the documentation guidelines included in the Centers for Medicare and Medicaid Services' Evaluation and Management Services Guide.   In terms of medical decision making, CPT code 99350 requires "moderate to high" complexity whereas CPT code 99215 requires "high" complexity.   As the comment attributed to AJIRI correctly refers to, in the Evaluation and Management Services Guide, the risk of morbidity associated with CPT code 99350 is "moderate" and "high," whereas the risk of morbidity associated with CPT code 99215 is "high."

### D. **AJIRI's Knowledge Regarding Use of CPT Code 99349 as Default Code**

78.     Individual MH, the former Chicago branch manager prior to 2008, said that during the time that she worked for Mobile Doctors, the practice was to have physicians mark on the routing slips which level a visit should be billed at.   According to Individual MH, she heard AJIRI tell physicians, "No ones or twos," which she understood to be AJIRI telling physicians not to code their visits at CPT codes 99347 or 99348.   According to Individual MH, AJIRI also told physicians, "I don't pay for ones or twos," which she understood to mean that physicians would not get paid if they coded their visits using CPT codes 99347 or 99348.   According to Individual MH, AJIRI explained to her that CPT code 99349 was the default code for a patient visit so that the payment for the visit would be worth the gas and time spent.

79.     Individual JB is a former employee who participated in Mobile Doctor's training program for branch managers in early 2012 and resigned from Mobile Doctors in August 2012.

According to Individual JB, as part of that training program, Individual JB shadowed employees in multiple parts of the company, including billing. In January 2012, Individual JB wrote an email to AJIRI and others that summarized what she learned from a clinical coordinator:

> The clinical coordinators also have to make sure that the visit is graded on the routing slip. For billing purposes, a 3 [CPT code 99349] is the most commonly marked which is for a less than 60 minute visit for existing patients. A grade of 4 is given … for those appointments that go over 60 minutes for existing patients [CPT code 99350].

80. AJIRI responded to Individual JB's email the next day and made a correction to one part of the email, but did not question or comment on Individual JB's summary of billing.

81. Similarly, another branch manager in training, Individual BR, sent an email in April 2012 summarizing her time observing a clinical coordinator in Mobile Doctors' Chicago office, and her understanding of Mobile Doctors' billing and upcoding practices:

> Yesterday I spent half of the day in the office sitting and observing Max. We went over some of the CC [clinical coordinator] duties and he explained to me what he was looking for while he was charting. He followed the CC checklist to make sure he did not make a mistake. He explained to [me] that … an existing patient would be a level three [CPT code 99349]; this is all in the case that the visit went well and was within the time limits. If for any chance there was difficulty during the visit then the patient would be upcoded [to CPT code 99350] …

82. AJIRI responded to Individual BR's email by reminding her to send such summaries every day.

83. Individual LV is a current employee who manages one of Mobile Doctors' branches and contacted law enforcement in August 2013 with concerns about Mobile Doctors' billing practices. According to Individual LV, AJIRI has told her about visits, "Everything starts at a level 3 [CPT code 99349]," and then can go up to "level 4 [CPT code 99350]."

84. Moreover, Individual SH, who works currently in Mobile Doctors' billing

29

department, said that AJIRI regularly reviews the Explanation of Benefits forms that are sent to Mobile Doctors and that show how claims have been billed and paid.

85.     Accordingly, I believe that AJIRI knows that Mobile Doctors visits are billed to Medicare primarily using CPT codes 99349 and 99350, which are for visits that are typically 40 minutes or 60 minutes.

### E. Mobile Doctors Further Improperly Upcodes Patient Visits to Highest Level

86.     As described below, AJIRI and others working for Mobile Doctors have fraudulently upcoded visits to the highest level.

#### 1. Individual MH Saw AJIRI Alter Routing Slips

87.     According to Individual MH, who was the manager of the Chicago branch prior to her termination in or around 2008, she first learned that Mobile Doctors was billing at least some visits at a higher level than the physicians had marked on the white copies of the routing slips when a patient called to complain about his or her benefits information. Medicare patients typically receive benefits information stating the claims that have been paid on their behalf.

88.     According to Individual MH, she reviewed the white copy of the routing slip that remained in the patient's file and saw that it showed that the visit should have been billed at a lower level than was shown on the patient's benefits information. Individual MH asked AJIRI about this, and he said that he would take care of it. Individual MH did not know what if anything AJIRI did afterwards.

89.     According to Individual MH, she went into AJIRI's office at the end of a day to say good night and saw AJIRI cross out the codes on the yellow copy of the routing slips which were sent to billing and mark the visits instead at the highest level. She said that AJIRI did not have

any patient files with him and was not reviewing any files as he altered the routing slips. She said that AJIRI was altering the files "automatically," and altered several routing slips during the time that she was in his office. She said that this occurred at the offices that Mobile Doctors used at the time; Mobile Doctors moved to the **Subject Premises** several years following Individual MH's termination.

90. Individual MH also recalled seeing yellow copies of routing slips which she knew had been reviewed by AJIRI because she recognized his initials on them and understood those to be his indicating that the documents were ready for the billing department. She said that she flipped through them and saw that some had been altered as she had seen AJIRI do in his office.

## 2. Physician MT Confronted AJIRI about Changes in Routing Slips

91. As discussed above, Physician MT said that only one of his patients justified billing at the highest level. Physician MT said that he became concerned about billing practices at Mobile Doctors and asked to see the Explanation of Benefits forms that his patients received from Medicare. According to Physician MT, he noticed a large amount of visits coded using CPT code 99350, even though he coded all visits except for those for Patient PO using lower levels.

92. According to Physician MT, he had a meeting with AJIRI in or around late 2007 in which he talked about the coding of visits using CPT code 99350, as well as Physician MT's concerns that physicians were being forced to sign home health certification forms even when the patients were not confined to their homes and did not require home health services. Physician MT also discussed his concerns that patients were being automatically scheduled for monthly visits even when such frequent visits were not medically necessary. According to Physician MT, AJIRI did not respond to his concerns, and instead shifted the subject and said that Physician MT

31

could earn more money if he ordered more tests such as echocardiograms.

93.     According to Physician MT, AJIRI also asked how Physician MT knew about that patient visits were being billed at higher levels than what physicians had marked.   Physician MT said that he told AJIRI that he had reviewed patients' Explanation of Benefits forms.

### 3.  AJIRI Instructed Individual JP to Alter Routing Slips

94.     According to Individual JP, who was Mobile Doctors' director of quality assurance from in or around 2006 through late 2010, AJIRI instructed him in the fall of 2009 to assist in the upcoding of established-patient visit claims to the highest level for about a year. [3]   Individual JP recalled that this occurred in the fall of 2009 because he recalled that it occurred after a major event in his personal life in 2009.   AJIRI said that he had been reviewing the routing slips himself prior to the fall of 2009, but that he could not review them all by himself as Mobile Doctors' patient population had increased, as has the corresponding number of routing slips to be reviewed. According to Individual JP, AJIRI said that Individual JP was the only one that AJIRI trusted to review the routing slips.

95.     According to Individual JP, in the fall of 2009, AJIRI sent an email to Individual JP with a Word document that consisted of instructions and guidelines for reviewing routing slips. According to Individual JP, AJIRI said that these instructions were what AJIRI himself used when reviewing routing slips.   According to Individual JP, AJIRI said that these instructions were designed to increase payments to Mobile Doctors while avoiding red flags that would draw the

---

[3]     As noted in paragraph 8, before being contacted by law enforcement, Individual JP contacted Medicare in the fall of 2011 and reported that Mobile Doctors was engaging in the upcoding conduct described here.   The government is not aware of any financial interest of Individual JP in the government's investigation.

attention of Medicare.

96.      According to Individual JP, after AJIRI sent the email to him, AJIRI and Individual JP exchanged versions of and made changes to the "Evaluating Routers" Word document, which became longer and more extensive.   According to Individual JP, the document was finalized in or around September or October 2009.

97.      According to Individual JP, Individual JP altered the yellow copy of the routing slips as per AJIRI's instructions.   Initially, Individual JP gave the routing slips to AJIRI for him to review, and AJIRI returned the routing slips to Individual JP if Individual JP missed something that AJIRI said would justify changing a visit to the highest level.   Individual JP then provided the routing slips to the Mobile Doctors billing department for billing to Medicare.

98.      Individual JP provided agents with access to files from his hard drive, which contained two versions of the Word document, which was entitled "Evaluating Routers." According to metadata, the earliest version of the "Evaluating Routers" document was last modified on May 8, 2009, which is several months before the time that Individual JP says he was instructed to upcode routing slips and which was more than two years before agents interviewed Individual JP.   Individual JP's hard drive also contained a second version of the document, which according to metadata was last modified on October 15, 2009, around the time that Individual JP says he was instructed to upcode routing slips and more than two years before agents interviewed Individual JP.

99.      The first item in the May 8, 2009 version of the "Evaluating Routers" Word document stated, "Medicare # start with a letter.  Highest."   According to Individual JP, AJIRI said that every time that a Mobile Doctors physician saw a patient who was insured by the

33

Railroad Retirement Board (as indicated by a Medicare number starting with a letter), that visit should be billed at the highest level so Mobile Doctors would get an additional $40 payment. As discussed above, in 2009, the Medicare fee for a visit coded using CPT code 99349 was approximately $122.82, whereas the Medicare fee for a visit coded using CPT code 99350 was approximately $171.25, approximately $48 more.

100. According to a review of claims data for Railroad Retirement Board patients, every single established-patient visit involving a Railroad Retirement Board patient between January 2007 and June 2008 was billed to Medicare using CPT code 99350. Overall, as shown in the graph below, between January 2007 and November 2012, approximately 93 percent of such visits were billed using CPT code 99350.



101. For example, Patient CM, who was referred to above in paragraph 48, receives health care via the Railroad Retirement Board. According to claims data, Mobile Doctors physicians visited Patient CM 17 times from May 2011 through September 2012, and Mobile Doctors billed each visit at the highest level, using CPT code 99350. As discussed above, Patient

34

CM told agents in May 2013 that his visits with Mobile Doctors physicians are and have been approximately 20 minutes in length and routine in nature.

102.    Another item in both versions of the "Evaluating Routers" document stated, "Patient in Indiana?"   According to Individual JP, if a patient was in Indiana, AJIRI instructed that all home visits be upcoded to the highest level (99345 for new patients and 99350 for established patients) because AJIRI stated that, at the time, there was no competitor in Indiana against whom Mobile Doctors' billing could be compared by Medicare.

103.    The graph below shows the percentage of established-patient visits that were billed at the highest level for patients with residences in Indiana against the percentage of such visits for patients with residences in Illinois and Michigan.   As seen below, most established-patient visits in Indiana were billed using CPT code 99350, and at much higher rates than in Illinois and Michigan until late 2012 and afterwards, which I believe may reflect a concern that there was enough data by that time for Indiana patients that Mobile Doctors' upcoding practices would raise red flags if not modified.[4]

---

[4]      Rates for established-patient visits for patients whose residences are in Illinois have been excluded from the graph for the period from September 2011 through December 2011 since the claims data shows less than 50 established-patient visits at any level billed for such patients in those months, significantly fewer than the roughly 2,000 established-patient visits billed per month in early 2011 and again in early 2012.



104. Another item in both versions of the "Evaluating Routers" document states: "Less than 60 a month but RR, Indiana and cash pay don't count." According to Individual JP, AJIRI instructed him to monitor and track the number of times per month that he upcoded visits to the highest level on the routing slips (corresponding to CPT code 99345 for new patients and 99350 for established patients). According to Individual JP, AJIRI said that if physicians had more than 60 visits at the highest level in a given month, not counting Indiana patients or Railroad Retirement Board patients or patients who paid in cash, this would raise red flags. Individual JP tracked to make sure that each full-time physician averaged 60 visits at the highest level every month.

105. Individual JP provided agents with the handwritten sheets that he used to track

from April 2010 through September 2010 the number of visits that were originally marked using CPT code 99350 or that he upcoded to CPT code 99350. A review of claims data for the same months in 2010 shows that for those physicians whose visits Individual JP upcoded, there were less than 60 established-patient visits billed under CPT code 99350. Five such physicians averaged approximately 55 such visits each month during the period tracked in Individual JP's handwritten sheets.

106. Individual JP said that he did not know such upcoding was illegal when he first began reviewing routing slips at AJIRI's direction. According to Individual JP, in or around April or May 2010, he began researching a Medicare question when AJIRI was out of town, and realized in the course of that research that he was involved in illegal upcoding. Individual JP said that he confronted AJIRI about this upon AJIRI's return, and that AJIRI became upset. Individual JP said that he then continued to upcode at AJIRI's direction until he was fired in late 2010.

### 4. AJIRI Participated in Discussions about Avoiding Medicare Scrutiny Regarding CPT Code 99350

107. As described above, in 2007, AJIRI was part of an email group that received advice from a physician in another state about how to code home visits. As discussed in more detail below, some of the advice corresponds to an instruction that AJIRI gave Individual JP about upcoding, specifically, the instruction that physicians bill 60 or less visits at the highest level per month, which corresponds to the advice AJIRI received that more than two or three visits per day (approximately 60 to 90 visits per month) would be a red flag to Medicare auditors.

108. In the version that AJIRI received by email in June 2007, Physician TK advised that

37

Medicare auditors look for outliers in the claims data, which Physician TK referred to as "betas." Physician TK also included comments from a "Detroit group," which indicated a belief that two or three claims per day per doctor billed using CPT code 99350 would not be an outlier and thus would not draw attention from Medicare.

- "Wisconsin Physician Services (WPS), our Medicare carrier, said that we billed outside their beta for # of 99350 visits. I tabulated that they allow around 3, 99350s per day"

- "From a member: We generally bill around 2-3, 99350s per physician per day. This is our local carrier standard. If you can find out what your local carrier's beta is then you'll also know how many 99350s you can bill in a day."

109. The comments from the "Detroit group" also include a comment that the document states was "from Dike Ajiri":

As to being compared to your peers, I would make sure anyone who sees older patients is listed as Geriatricians with Medicare. If you are listed as something else you can change it. Just call the carrier. Since there are fewer geriatricians the "Bell curve" of the comparative distribution review will allow for more outlier cpt codes (house calls) as there is a smaller sample. From Dike Ajiri.

110. On July 10, 2007, Physician TK sent a revised version of the memo to AJIRI along with more than 30 other recipients. The revised document contains the comments described above that were attributed to AJIRI in the June 2007 version, but attributes the comments simply to a "member."

### 5. AJIRI Has Provided Instruction on How to Make Patient Files Appear to Justify Billing

111. In addition, several former employees said that AJIRI insisted on charts having three or more diagnoses for any given visit, which I believe was a method that AJIRI employed to attempt to make charts for routine patient visits appear to justify billing using CPT codes 99349 or

99350.

112.    According to Individual RF, who was the manager of the Chicago branch office from 2008 to 2011, AJIRI directed him to make sure that each visit had three diagnoses and to encourage physicians to add diagnoses after a visit if the doctor indicated only two diagnoses. According to Individual RF, some physicians then would add to the charts that a patient had osteoarthritis.

113.    Individual VS began working for Mobile Doctors in 2008 as a clinical coordinator and then worked in the billing department.   She said that if a visit was coded using a lower code and only had one or two diagnoses, AJIRI's instructions were to find a third diagnosis and use a higher code for the visit.   According to Individual VS, this change was usually made without consulting the Mobile Doctors physician who saw the patient.

114.    Individual LV, the manager of the Chicago branch, said that she was taught that there should always be at least three diagnoses given for each visit.   Similarly, Physician BG1 told agents that Individual LV wanted physicians such as himself to indicate three or four diagnoses for each patient.   Physician BG1 said that he thought that some of these diagnoses were bogus, and wrote, "not an active issue" somewhere on the medical record or chart to indicate his opposition to including the diagnosis on the charts.   Physician BG1 noted one example of a patient whose back problems were the result of a football injury and said that the diagnosis of osteoarthritis was incorrect with regards to that patient.

115.    In fact, a review of patient files obtained by Trust Solutions from Mobile Doctors during a 2011 audit show that the patient visits were routine in nature even when the routing slips showed multiple diagnoses for a particular patient.

39

116.    According to a review of the patient files obtained by Trust Solutions, for every visit, there typically are the following forms: (1) the routing slip, (2) a three-page form entitled "Mobile Doctors Physical for Established Patients," in which the physician marks the patient's pulse and blood pressure, any changes in the patient's condition since the last visit, the physician's review of the patient's systems, and the physician's comments on the patient's assessment and plan of care.

117.    Such files for Patient MW, who lives in Indiana, contrast with the claims data. According to claims data, all of KOROMA's visits with Patient MW were coded using CPT code 99350, consistent with the instructions that AJIRI gave Individual JP.   In fact, according to claims data, KOROMA and another Mobile Doctors physician, Physician B, had approximately 69 established-patient visits with Patient MW from October 2006 through August 2012. Approximately 66 were billed to Medicare using CPT code 99350, including all of the visits from 2009, and only three were billed to Medicare using CPT code 99349.

118.    In contrast, however, the charts for KOROMA's visits with Patient MW that were obtained in the 2011 audit show that the visits were routine in nature.

119.    First, each routing slip itself indicates that the visit should have been coded using CPT 99349, as that line is checked in the section for "Home Visits."    The relevant section of the January 2009 routing slip is:

120.     Each routing slip does show four or more diagnoses.   For the January 2009 visit, the routing slip contains four diagnoses:   "OA [osteoarthritis]," "HTN [hypertension]," "IGT [impaired glucose tolerance test, which refers to an ICD-9 code relating to abnormal glucose]," and "CRI [chronic renal insufficiency]."   All visits from February 2009 through December 2009 contain the same four diagnoses, along with insomnia, indicating little change in Patient MW's condition.

121.     Each routing slip did not contain any additional information about Patient MW's condition, except for the results of a pulse oxygen test.   The routing slips showed that Patient MW's pulse oxygen was in the 97 percent to 100 percent range each time.   As noted above, according to Individual LH, who was the director of clinical coordinators from 2011 to July 2013, clinical coordinators are taught that a pulse oxygen reading of less than 90 percent would justify marking a visit with CPT code 99350.   Accordingly, the pulse oxygen readings would not justify billing the visit under CPT code 99350 even under Mobile Doctors' internal guidelines.

122.     Second, the three-page "Mobile Doctors Physical for Established Patients" forms all show the same information about each visit.

123.     The first page of the "Mobile Doctors Physical for Established Patients" form contains a space for the physician to mark any changes in the patient's condition since the last visit. For 11 out of the 12 visits in 2009, KOROMA wrote the following:

    Ө hosp/er visits [no visits to the hospital or emergency room]

    Ө new medical problems [no new medical problems][5]

_____

[5]      The only time that KOROMA wrote something different was for the February 2009 visit,

41

θ Δ in any current medical problems [no change in any current medical problems]

124.   This section from the form for the January 2009 visit is below:



125.   The bottom of the first page and the second page of the "Mobile Doctors Physical for Established Patients" form show that KOROMA reviewed Patient MW's systems during each visit. For each visit, KOROMA marked that Patient W's systems were all "within normal limits," except for her musculoskeletal system. Regarding her musculoskeletal system, he marked that Patient MW had joint pain and sometimes joint swelling. The bottom of the first page of the January 2009 form is below:

| WNL | Review of Systems: circle only positive results, check (√) if WNL |
|---|---|
| √ | General: fevers, chills, weight loss, weakness malaise |
| √ | ENT: dizziness, hearing loss, sore throat, rhinorrhea, tinnitus |
| √ | Eyes: visual changes, eye pain, eye discharge |
| | Neck: pain, stiffness |
| √ | Resp: SOB, cough, DOE, sputum |
| √ | CV: chest pain, palpitations, orthopnea, PND |
| √ | GI: nausea, vomiting, diarrhea, constipation, melena, BRBPR |
| √ | GU: frequency, dysuria, urgency, hematuria, urethral discharge |
| | GYN: vaginal bleeding, vaginal discharge, pelvic pain |
| | Neurologic: faint, dizzy, unsteady gait, numbness, weakness |
| | Musculoskeletal: joint pain, joint swelling |
| √ | Endocrine: polyphagia, polydipsia |
| √ | Allergy: hives, itching, allergic rhinitis |
| √ | Psych: depressed, anxious, hallucination |
| √ | Skin: rash, decubitus ulcer |
| COMMENTS: | |

126.   The final page of the "Mobile Doctors Physical for Established Patients" form contains a space for the physician to take notes about the physician's assessment of the patient and

when he noted that Patient MW had insomnia for the first time.

his or her plan of care for the patient, with lines for up to six problems and corresponding plans. For each visit, KOROMA wrote three of the four conditions. Every time he wrote "HTN [hypertension]," the plan was "Tylenol." Every time he wrote "HTN," the plan was the same medication. Every time he wrote "CRI [chronic renal insufficiency]" or "IGT [referring to an abnormal glucose condition]," the plan was simply "Monitor." This section of the January 2009 form is below:

127. When interviewed, Patient MW said that KOROMA saw her and her husband once a month at the same time. She said that the visits were at the most 30 minutes long for KOROMA to see both her and her husband. She said that her health condition was stable and had not changed over the past few years.

128. According to claims data, Mobile Doctors submitted claims for approximately 72 patient visits with Patient MW's husband. Of those, approximately 69 were billed using CPT code 99350, and three were billed using CPT code 99349.

43

129.     Accordingly, based on a review of the files for all 12 of KOROMA's visits with Patient MW, and based on my knowledge of the investigation overall, I do not believe that there was anything in the files that would have justified billing each visit using CPT code 99350, either under the Current Procedural Terminology manuals or under Mobile Doctors' own guidance for clinical coordinators.   I believe that all of these visits were billed using CPT code 99350 as a result of a factor that Individual JP said that AJIRI admitted using to upcode, which is that Patient MW lived in Indiana.

### 6. **Individual TC Continues Upcoding After Individual JP's Termination**

130.    As referenced in the sections and graphs above, the upcoding that Individual JP described continued after Individual JP was fired from Mobile Doctors in late 2010. According to former branch manager Individual RF, AJIRI hired Individual TC as new director of quality assurance after Individual JP was fired in or around 2010, and Individual TC received and reviewed routing slips as Individual JP had.

131.    According to Individual LH, who was a clinical coordinator in 2011 and was director of clinical coordinators for the Chicago branch from late 2011 to July 2013, when she was terminated, after a clinical coordinator marks the routing slip, the white page goes into the patient's file, and the yellow copies are provided to Individual TC for review. According to Individual LH, Individual TC picks up the yellow copies for the Chicago branch from the branch's clinical coordinators, who are located in the first floor of the **Subject Premises**.

132.    According to Individual LH, if Individual TC identifies a mistake during his review of the yellow copy of the routing slips, Individual TC sends the yellow copy back to the clinical coordinators to correct. According to Individual LH, clinical coordinators mark any corrections with their initials and an explanation of the mistake that is being corrected.

133.    According to Individual LH, she recently talked to a person who is not a member of law enforcement about approaching the government. That person asked if Mobile Doctors was billing visits at higher levels than they should be. Individual LH then went to Mobile Doctors' billing department and asked a member of the billing department to see the yellow copies of routing slips and was given a set. She reviewed the set and saw that a third to half of the yellow copies had been altered so that the highest level, CPT code 99350, was marked for billing.

45

134. Individual LH made copies of the yellow copies as well as the white versions from patient files for approximately 14 patients who were seen by three physicians on May 23 and May 24, 2013. She also made copies of the "Physical for Established Patients" forms for five of the patient visits. Individual LH then provided these documents to law enforcement officials via an intermediary. The government did not speak to Individual LH until after the documents had been received.

135. Each of the routing slips that Individual LH provided from the patient files indicated that the visit was to have been billed using CPT code 99349. Each of the yellow copies showed that the mark for CPT code 99349 was crossed out and instead indicated that visit was to be billed using CPT code 99350. None of the yellow copies contained explanations for why the mark for CPT code 99349 had been crossed out, and none of the yellow copies had any initials indicating that a clinical coordinator had made the change. As noted above, Individual LH said that the yellow copies should show initials and an explanation if Individual TC had simply found a mistake in a clinical coordinator's work.

136. For example, the image on the left below shows the white copy of the routing slip which Individual LH said is in Patient LC's file, whereas the image on the right shows the yellow copy of the routing slip which Individual LH received from a member of the billing department.

*Version from Patient LC's file*            *Version from billing department*

46

137.    Individual LH also provided routing schedules for the three physicians for May 23

and May 24, 2013.   Each of the routing schedules includes arrival times and departure times for

each patient visit, and each routing schedule showed that the patient visits were no more than 26

minutes long and as short as 10 minutes.   For example, as shown in the table below, Physician SN

spent no more than 10 minutes with Patient ME on May 24, 2013.

| Patient | Date | Approximate number of Minutes Between Arrival and Departure Times | Physician |
|---------|------|------------------------------------------------------------------|-----------|
| EF | 5/23/2013 | 20 | SN |
| MM1 | 5/24/2013 | 26 | SN |
| NR | 5/23/2013 | 15 | SN |
| ME | 5/24/2013 | 10 | SN |
| LT | 5/24/2013 | 16 | SN |
| LC | 5/24/2013 | 19 | SN |
| GH | 5/23/2013 | 15 | GH |
| MM2 | 5/23/2013 | 24 | GH |
| WH | 5/23/2013 | 17 | GH |
| WG2 | 5/23/2013 | 14 | GH |
| MB | 5/23/2013 | 16 | GH |
| JS | 5/24/2013 | 17 | KH |
| EL | 5/24/2013 | 16 | KH |
| WW | 5/24/2013 | 16 | KH |

138.    Individual LH said that she reviewed the yellow copies of the routing slips and saw

no justification for the visits to be billed at the highest level.

139.    Moreover, law-enforcement officials have reviewed the patient charts, including

"Physical for Established Patients" forms, which Individual LH provided along with the two sets

of routing slips and the routing schedules described in the paragraph above.   As summarized in

the table below, none of the forms showed any indication that the visits involved the criteria listed

in the clinical coordinators' orientation materials for when a visit should be billed using CPT code

47

99350:

| Guideline for Clinical Coordinators | Patient EF | Patient MM1 | Patient GH | Patient MM2 | Patient JS |
|---|---|---|---|---|---|
| Poses a threat to life or bodily function | No note of such | No note of such | No note of such | No note of such | No note of such |
| The visit lasted longer than 60 minutes | 20 minutes or less | 26 minutes or less | 15 minutes or less | 25 minutes or less | 17 minutes or less |
| Blood Pressure above 180/110 | 146/70 | 128/70 | 132/74 | 122/60 | 120/80 |
| Blood Sugar above 400 or below 50. | No note of such | No note of such | No note of such | No note of such | No note of such |
| Pulse Ox reading of 90 or below. | 100% | 99% | 96% | 95% | 98% |
| The patient is advised to go to the ER | No note of such | No note of such | No note of such | No note of such | No note of such |
| The patient is referred to Hospice or a Nursing Home | No note of such | No note of such | No note of such | No note of such | No note of such |

140.    When interviewed by agents, Patient LC's daughter said that she is present with Patient LC during her visits with a Mobile Doctors physician.    According to Patient LC's daughter, the visits are approximately 15 to 20 minutes in length.    During the visits, the physician checks Patient LC's hands and feet, her medications, and her blood pressure.    When asked in particular about the May 24, 2013 visit, Patient LC's daughter did not recall anything unusual about this visit.    Patient LC's daughter said that Patient LC had Alzheimer's disease and had high blood pressure, but her condition was stable, and that Patient LC visited a primary-care physician every three or four months at that physician's office.

48

141.    According to claims data, Mobile Doctors has billed approximately four established-patient visits with Patient LC using CPT code 99349 and approximately seven visits using CPT code 99350.   In particular, Mobile Doctors submitted a claim for payment for the May 24, 2013 visit by Physician SN with Patient LC on or about June 26, 2013, and was paid approximately $147.16 for the visit on or about July 5, 2013.

142.    Similarly, Patient ME told agents that Physician SN's visits were approximately 20 to 30 minutes in length.   She said that the physician checks her medications and checks if she needs anything.   According to claims data, Mobile Doctors has billed approximately 35 established-patient visits with Patient ME using CPT code 99349 and approximately 3 visits using CPT code 99350.   In particular, Mobile Doctors submitted a claim for payment for the May 24, 2013 visit by Physician SN with Patient MW on or about June 26, 2013, and was paid approximately $187.70 for the visit on or about July 5, 2013.

143.    In addition, Individual NN, who lives with Patient WG2 and helps take care of him, said that the visits by Physician GH are about 15 to 20 minutes in length.   According to Individual NN, during the visits, Physician GH checks Patient WG2's vitals.   Individual NN said that Physician GH often engages in small talk with Patient WG2, particularly about the Chicago Cubs. According to claims data, Mobile Doctors has billed approximately 4 established-patient visits with Patient WG2 using CPT code 99349 and approximately 20 visits using CPT code 99350.

### 7. Individual TC Gives False Justification When Asked About Upcoding

144.    According to Individual SH, who currently works in Mobile Doctors' billing department, members of the billing department have asked Individual TC why some yellow copies of routing slips indicate that the respective visits should be billed using CPT code 99350 even

though nothing on the routing slip indicates why the visit should be billed this way under Mobile Doctors practices. Individual SH said that such yellow copies are marked with CPT code 99350 in a way that appears random to her.

145. According to Individual SH, Individual TC has complained by asking why billing does not just bill what's on the sheet.

146. According to Individual SH, Individual TC also has responded sometimes by referring to alleged differences between the 1995 and 1997 editions of guidelines, which I believe to be references to the 1995 Documentation Guidelines for Evaluation and Management Services and the 1997 Documentation Guidelines for Evaluation and Management Services. According to Individual SH, Individual TC said that Mobile Doctors was operational in 1996 so some visits could be billed using the 1995 guidelines. Individual SH said that she was not convinced by Individual TC's explanation, which she did not view as making any sense.

147. According to the Evaluation and Management Services Guide, a physician can follow either the 1995 Documentation Guidelines or 1997 Documentation Guidelines in terms of their documentation of a patient encounter. Both sets describe medical histories and medical decision making in the same way, as described above. Both guidelines also define "comprehensive" examinations to include "a general multi-system examination" and a "complete examination of a single organ system," though the 1997 guidelines includes "other symptomatic or related body area(s) or organ system(s)" with the "complete examination of a single organ system."

**8. AJIRI Conceals Yellow Copies of Routing Slips From Branches**

148. Individual SH, who currently works in Mobile Doctors' billing department, said

that one of Mobile Doctors' branch offices once asked her to provide the billing department's copy of a routing slip. Individual SH did not recall why the branch made this request, but said that the branch may have misplaced the copy from the patient file. Individual SH did provide the yellow copy and recalled learning that it showed a higher billing code than the physician recalled.

149. According to Individual SH, AJIRI came to her afterwards and told her to never again share a yellow copy of the routing slip with a branch.

### 9. **AJIRI Discussed Use of CPT Code 99350 in March 8, 2012 Email**

150. On March 8, 2012, Individual CC, whose email signature states that she is a clinical manager in Mobile Doctors' Detroit office, wrote an email to Individual TC asking about why many "normal visits" appeared on some reports as "level 4 [CPT code 99350]" claims rather than as CPT 99349 claims. In her email, Individual CC wrote, "I know we normally bill at a level 3 for EP's [CPT code 99349] unless there is critical values or EMS is needed but she was also talking about new medications and new diagnosis." Individual CC then wrote that she had recently reviewed some reports that track patient visits per physician. According to Individual CC, "It was then that I noticed how many normal level 3 visits [CPT code 99349] are actually up coded to level 4 [CPT code 99350]. I assume it is just easier and lifts liability if it is done by billing to ensure accuracy but I was wondering if you have a list [of reasons for upcoding] for my own knowledge."

151. Individual TC forwarded Individual CC's email to AJIRI. AJIRI then replied, "Ironically when we pay our doctors for two level four EP's per day they could have zero. That has more to do with just how we pay our doctors."

152. AJIRI then forwarded his email to Individual DE and copied Individual TC.

51

AJIRI wrote, "If anyone else ever asks please just give this answer."

153.    In response to AJIRI's email, Individual CC replied, "I was a little confused as to why we only bill 2 level four EP's per day.   Is it to stay under the radar?   Just curious and confused."   Based on the investigation overall, I believe that Individual CC knew that Mobile Doctors actually billed more established-patient visits using CPT code 99350 than actually were warranted, and was asking AJIRI if Mobile Doctors was trying to avoid scrutiny by Medicare auditors by not billing even more.

154.    AJIRI did not reply to the clinical manager's email, but forwarded it to an assistant to print out.

### F. **Summary regarding Upcoding**

155.    As discussed herein, probable cause exists that the vast majority of payments made on established-patient visit claims submitted using CPT codes 99350 were the result of fraud, specifically, the upcoding described above.   According to claims data, as shown in the table below, for claims from 2006 through 2012, Mobile Doctors has received approximately $21.4 million in payments on claims using CPT code 99349 and approximately $12.6 million in payment on claims using CPT code 99350.

|      | CPT Code 99349 | CPT Code 99350 |
|------|----------------|----------------|
| 2006 | $194,247.80    | $90,860.03     |
| 2007 | $1,333,528.58  | $741,535.12    |
| 2008 | $2,660,616.13  | $1,341,994.18  |
| 2009 | $3,214,324.50  | $1,324,121.14  |
| 2010 | $4,243,889.02  | $2,370,933.11  |
| 2011 | $4,240,953.01  | $3,015,220.17  |

|  | CPT Code 99349 | CPT Code 99350 |
|---|---|---|
| 2012 | $5,554,540.43 | $3,733,092.56 |
| **Total** | **$21,442,099.47** | **$12,617,756.31** |

## VII. Mobile Doctors Physicians Falsely Certified Patients as Confined to their Homes

156. Based on the investigation overall, including the interviews and analysis discussed below, probable cause exists to believe that Mobile Doctors physicians, including KOROMA, have falsely certified patients as confined to their homes and requiring home health services when such patients are not confined to their homes and do not require home health services. By doing this, Mobile Doctors physicians have referred patients to home health agencies that bill Medicare for home health services that do not warrant payment. In turn, Mobile Doctors receives more referrals from those home health agencies for services provided by Mobile Doctors physicians.

### A. Referrals Between Mobile Doctors and Home Health Agencies

157. Mobile Doctors' own orientation materials indicate that Mobile Doctors works with home health agencies in order to get patient referrals. For example, according to a 2009 presentation entitled "New Employee Orientation," which AJIRI emailed to one employee:

> Advantages of a HOME HEALTH CARE AGENCY working with Mobile Doctors:
>
> If a Home Health Care nurse is out in the community taking care of a patient and they encounter another person that could use nursing services, it is easy to suggest that Mobile Doctors come out to care for that patient also.
>
> *Home Health Agencies who refer patients to us will get patient referrals from Mobile Doctors in return.*

53

(emphasis added)

158.    In addition, according to a 2009 document entitled "Physician Orientation:"

> *We get the vast majority of our patients from Home Health Companies.* They have patients that need to be seen by a physician in order to provide care in the home. Our physicians see the patient and any services that are needed such as physical therapy, visiting nurses, CNA's, etc., are referred back to and are provided through the HHA. Having a physician see the patient and complete the 485's [home health certification and plan of treatment forms] is how the HHA is paid.

> *Home Health Agencies provide Mobile Doctor [sic] with the vast majority of our patient referrals.* All Home Health Care Agencies want to know when our doctor last came out and what the status of the patient is. We communicate this information daily to the Home Health Companies. Fax page 3 of Physical Exam (PEJ ) to the appropriate Home Health Care company.  If there are any changes in medications, then the Medication Profile is also faxed. There are patients we see that the HHA pays for the visit. In these cases, it is up to the HHA if any ordered tests will be done Mobile Doctors refers back to the Home Health Agencies.  Referrals for physical therapy, visiting nurses, CMA's and other services are provided through these companies. This helps continue a working relationship between the two organizations.

(emphasis added)

159.    In a December 10, 2008 email exchange between AJIRI and Individual JP, Individual JP notified AJIRI that a physician had refused to sign a home health certification form, sometimes referred to as a Form 485.   According to the employee, the physician "refused to sign them because he did not order physical therapy on the patients."   According to the email, one of the two patients had told the physician that she had already gone through physical therapy "but now seems to be going through some more [the patient believed that she had completed the physical therapy and was wondering why she was still getting such services]."   Individual JP continued in the email, "I will explain to him that this is one way we get more referrals.   I told him

54

this before.   One way or another, [another employee] or I will get him to sign them."

160.   AJIRI replied:

> Tell him [the physician who refused to sign a Form 485] these patients were referred to us from those agencies otherwise we'll get ZERO referrals. 95% of our referrals at our locations come from HHC's.

161.   According to Individual LV, who is a current branch manager, Mobile Doctors receives referrals from hundreds of home health agencies, and approximately 85 to 90 percent of its patients are referred from home health agencies.   According to Individual LV, her branch keeps a log indicating which home health agency is due for the next referral.

162.   According to Individual CT, who currently works in Mobile Doctors' corporate office, AJIRI said that home health agencies are Mobile Doctors' "bread and butter," and that Mobile Doctors should cater to home health agencies because the agencies need Mobile Doctors' physicians to certify their patients for home health services.   According to Individual CT, Mobile Doctors employees receive Form 485s from home health agencies and track whether physicians have signed the Form 485s.   According to Individual CT, some home health agencies pay Mobile Doctors to see the agencies' patients so that physicians will certify the patients for home health services.

163.   According to an analysis of Medicare Part A data, from August 2010 through July 2013, more than 200 home health agencies have submitted claims to Medicare for payment for home health services allegedly rendered to patients for whom a single Mobile Doctors physician, BANIO KOROMA, is identified as the referring physician.   Such home health agencies have been paid more than $10 million on such services listing KOROMA as the referring physician.

**B.**     **Certifications of Patients as Confined to their Homes**

55

164.    According to a review of claims data, from January 2006 through March 2013, Mobile Doctors physicians have certified or recertified approximately 15,598 patients as confined to their homes and requiring home health services a total of approximately 83,133 times. According to interviews with several former Mobile Doctors physicians, as well as some patients, probable cause exists to believe that many such certifications were false.

165.    For example, Physician JD said that she saw patients who did not appear to be homebound.  She said that she tried to cancel them from Mobile Doctors' services, but that Mobile Doctors instead assigned those patients to another physician.

166.    Physician SK, who used to work out of Mobile Doctors' Indianapolis office, noted in particular two patients who she said were very mobile.   According to Physician SK, one was an approximately 40 year old, African American male who was in good health except for high blood pressure and diabetes, and who asked if Physician SK could provide the medical services at his place of employment rather than his home.   The other patient was actually a caretaker for two other patients.   She did not recall those patients' names or personal identifiers.

167.    According to an analysis of claims data, the two most common diagnoses given in billing data for the certifications and recertifications by Mobile Doctors physicians are ICD-9 code 401.9, for "essential hypertension – unspecified" (approximately 15.2 percent) and ICD-9 code 250.00, for "diabetes mellitus without mention of complication, type II or unspecified type, not stated as uncontrolled" (approximately 6.1 percent).   Based on my training and experience, these conditions are not generally associated with patients being confined to their homes.

### 1.  Patient WG1

168.    For example, according to Medicare claims data, Physician BB has certified or

56

recertified Patient WG1 as confined to his home and requiring home health services approximately 21 times from November 2008 through December 2012.

169. By contrast, Patient WG1 said that he does use ambulatory assistance, including a walker, but is able to leave his house, and visits his primary-care physician at his office.

170. Physician FD, whom Patient WG1 identified as his primary-care physician and who has never worked for Mobile Doctors, said that he has seen Patient WG1 approximately four times a year since 2009. According to Physician FD, Patient WG1 is ambulatory, does not have any disabling conditions, and does not need home health care. Physician FD said that, prior to being interviewed, he was not aware that Patient WG1 was being treated by another physician. He said that if he had known that another physician was seeing Patient WG1, he would have stopped seeing Patient WG1 unless the patient stopped using the other physician because a patient having two primary-care physicians can lead to problems coordinating patient care.

### 2. Patient JC

171. As described above in paragraphs 53-55, both Physician BG1 and Patient JC herself have said that Patient JC is not confined to her home. Nevertheless, according to claims data, four Mobile Doctors physicians, including Physician BB, Physician BR, Physician BG1, and KOROMA, have certified her as confined to her home and requiring home health services approximately 26 times between 2008 and 2012. Physician BB certified Patient JC as confined to her home and requiring home health services approximately 21 times between 2008 and 2011, Physician GR then certified this patient another three times in 2011 and 2012, KOROMA certified this patient once in 2012, and Physician BG1 certified this patient once in late 2012.

172. Patient JC told law enforcement that she was absolutely not confined to her home and never has been. According to Patient JC, she did have a knee replacement in 2007, but that did not have any long-term effect on her ability to move. She said that she does have a primary-care physician whom she sees at his office when necessary.

## C. BANIO KOROMA's Certifications of Patients as Confined to their Homes

173. According to an analysis of claims data, the Mobile Doctors physician who certified the most episodes from 2006 through early 2013 is BANIO KOROMA, who certified or recertified approximately 1,204 patients a total of approximately 6,057 times. According to claims data, KOROMA has worked for Mobile Doctors since in or around 2007.

174. For example, according to Medicare claims data, KOROMA has certified or recertified Patient SM for home health services approximately 21 times from September 2008 through April 2013, each time for hypertension or diabetes. For example, Mobile Doctors submitted a claim to Medicare stating that KOROMA certified the patient for home health services on June 13, 2012. The claim was received by Medicare on October 24, 2012, and Mobile Doctors received a payment of $45.10 on November 7, 2012.

175. According to a document entitled "Documentation of Face to Face Encounter," on June 11, 2012, KOROMA certified that Patient SM was under his care and that he saw her on May 23, 2012. I have compared the signature on the form to the signature on KOROMA's driver's license, and believe them to be the same. Under text stating, "The encounter with this patient was in whole, or in part, for the following medical condition, which is the primary reason necessitating home health care," KOROMA wrote by hand, "lt [left] hemiparesis." According to the ICD-9 manual, hemiparesis is complete paralysis of one side of the body. Under text

58

stating that "my clinical findings support the need" for nursing services, KOROMA wrote by hand, "lt hemiparesis, HTN [hypertension], DM [diabetes mellitus], asthma, ↑chol [high cholesterol]."

176.    Under text stating, "I certify that my clinical findings support that this patient is homebound (i.e. absences from home require considerable and taxing effort and are for medical reasons or religious services or infrequently or of short duration when for other reasons because," KOROMA wrote by hand:

> Patient homebound due to weakness, unsteady gait, hemiparesis, HTN unable to leave home unassisted limited mobility

177.    In addition, KOROMA's signature is on the June 27, 2012, Home Health Certification and Plan of Care ordering home health services by Premier Home Health Care for Patient SM from June 13, 2012 to August 11, 2012.   In signing the form, KOROMA certified that "this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy.   The patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan."   KOROMA also certified that he was aware that "anyone who misrepresents, falsifies, or conceals essential information required for payment of Federal funds may be subject to fine, imprisonment, or civil penalty under applicable Federal laws."

178.    By contrast, Physician SD, who has never worked for Mobile Doctors and is an attending physician of internal medicine at Cook County Health and Hospitals System, told agents in March 2013 that she has been the primary care physician for Patient SM since 2009. Physician SD noted that Patient SM is in her 50s and considered Patient SM to be young.

59

According to Physician SD, Patient SM has hypertension, high cholesterol, smoking, diabetes, and a history of stroke. Physician SD said that Patient SM is ambulatory, is active, and is able to walk a mile.

179.     According to Physician SD, Patient SM has been able to come to office visits. In fact, according to her Medicare claims history, Patient SM had two office visits with Physician SD in 2012, including once on June 13, 2012 and August 12, 2012. Both visits occurred during periods in which KOROMA had certified that Patient SM was confined to her home and required the services of a home health agency.

180.     Patient SM herself told agents in March 2013 that she is able to leave her home and did leave the home several times a week prior to a stroke that she suffered in February 2013. She also said that she was able to visit her primary care physician, whom she identified as Physician SD, at her office every four to six months. She also said that she visits a cardiologist at Stroger Hospital every four to six months and takes the bus to get there.

181.     Physician SD said that, prior to being interviewed by law enforcement, she had not heard of Mobile Doctors and was not aware that Patient SM was being treated by KOROMA. She said that if she had known that a Mobile Doctors physician was seeing this patient, she would have stopped seeing the patient unless the patient stopped using Mobile Doctors.

182.     According to Medicare Part A data, Premier Home Health Care has been paid approximately $22,988.12 for home health services for Patient SM. According to this data, Premier continued to bill home health services for Patient SM in 2013 and continued to list KOROMA as the referring physician.

**VII.     Other Billing Practices**

60

183. As discussed below, former and current employees have identified other illegal activities regarding the billing and ordering of tests such as echocardiograms.

**A. Billing Ultrasound Examinations that Physicians Did Not Perform**

184. As discussed below, probable cause exists that Mobile Doctors submits false information regarding ultrasound examinations to make it appear that Mobile Doctors physicians are performing such tests, rather than technicians for In Home Diagnostics, also known as Ultrasound2You, a company that is owned by Mobile Doctors' head biller (Individual DE) and by AJIRI. By billing this way, Mobile Doctors gets payment for services that should be paid to other entities such as In Home Diagnostics.

185. According to claims data submitted by Mobile Doctors, based on claims submitted using CPT code 93306, Mobile Doctors physicians have performed and interpreted thousands of echocardiograms. According to Dr. Stephen Boren, an assistant professor of emergency medicine at the University of Illinois, who works with Wisconsin Physician Services, an echocardiogram is a test that uses sound waves to show the size of a patient's heart, the thickness of the surrounding area, and the efficiency of the heart valves. According to Dr. Boren, an echocardiogram is typically used for patients whose hearts are or may not be functioning properly, such as a patient who recently had a heart transplant.

186. Individual SH, who works in Mobile Doctors' billing department, said that Mobile Doctors submits claims that make it appear as if Mobile Doctors physicians conduct the echocardiograms. However, according to Individual SH, in reality, technicians who work for In Home Diagnostics perform the echocardiograms and the results are then sent to another physician to be examined.

61

187. Similarly, records from patient files obtained during a 2011 audit by TrustSolutions show that Ultrasound2You technicians perform the echocardiograms and that physicians who are not Mobile Doctors physicians review the results and write reports summarizing their findings.

188. According to Kelly Hartung, who oversees the implementation of Medicare policies and regulations for Wisconsin Physician Services, if a technician took an echocardiogram and a physician then interpreted the echocardiogram, then the echocardiogram should be billed in two parts. The technician's part should be billed under the technician's provider number using CPT code 93306 and a modifier referencing the technical component (specifically, the modifier "TC"), and payment for this part should go to the technician. The physician's part should be billed under the physician's provider number using CPT code 93306 and a modifier referencing the physician's professional component (specifically, the modifier "26"), and payment for this part should go to the physician interpreting the echocardiogram. According to Hartung, if a physician simply ordered the test but did not take the echocardiogram or interpret it, that physician should not bill the echocardiogram and should not receive any payment for the echocardiogram.

189. By contrast, according to a review of claims data, from 2009 to March 2013, via Lake MI Mobile Doctors, Mobile Doctors submitted approximately 6,853 claims to Medicare using CPT code 93306, listing Mobile Doctors physicians as the rendering physician, and not including the "TC" or "26" modifiers, thus falsely indicating that Mobile Doctors physicians had taken and interpreted those echocardiograms themselves. According to claims data, Mobile Doctors was paid a total of approximately $1.286 million on such claims.

62

190.    According to a review of claims data, via Lake MI Mobile Doctors, Mobile Doctors submitted approximately 4,975 claims to Medicare using CPT code 93306, listing Mobile Doctors physicians as the rendering physician, and including the "26" modifier, falsely indicating that Mobile Doctors physicians had interpreted those echocardiograms themselves, rather than the physicians who work for Ultrasound2You.   According to claims data, Mobile Doctors was paid a total of approximately $280,281.64 on such claims.

191.    Individual SH said that she told Individual DE earlier this year that In Home Diagnostics should bill its ultrasounds, rather than having Mobile Doctors bill the ultrasounds as if Mobile Doctors physicians performed the examinations.   According to Individual SH, Individual DE agreed with Individual SH but said that AJIRI would be mad because less of the Medicare payments would go to AJIRI.

192.    According to Medicare enrollment documents filed in 2012, Individual DE is the president/CEO of In Home Diagnostics, as well as an owner and partner, and AJIRI is a minority partner.

193.    According to Individual SH, she then spoke to AJIRI and Individual DE about how the ultrasounds were billed.   According to Individual SH, AJIRI said that it was a grey area.   Individual SH said that she said that it was not a grey area and provided documents to AJIRI to support her position.   According to Individual SH, Individual DE said after the meeting that Mobile Doctors was going to change practices, but the practice has not changed.

194.    According to Individual AT, she had a conversation with Individual DE about whether Mobile Doctors' practice of having ultrasounds done by In Home Diagnostics violates the Stark Act, Title 42, United States Code, Section 1395nn, which generally prohibits a

physician from making referrals for certain services payable by Medicare to an entity with which the physician or a family member has a financial relationship. According to Individual AT, Individual DE replied that In Home Diagnostics was separate from Mobile Doctors.

195. In fact, In Home Diagnostics' office is in the same building as Mobile Doctors' Chicago office, which is located at 3319 N. Elston, Chicago, Illinois, and its billing is done by Mobile Doctors employees. Moreover, Mobile Doctors' orientation materials refer to echocardiograms being performed by Mobile Doctors' "own" ultrasound technicians, indicating the strong connection between the two companies. According to a 2010 new employee orientation presentation, Mobile Doctors can have "dopplers and ultrasounds done in the patient's home, performed by our own doppler or ultrasound technician."

### B. Ordering Medically Unnecessary Tests

196. As described below, several employees have said that Mobile Doctors has and has had policies designed to order tests even when the physicians have not ordered such tests.

197. Individual LV, who runs one of Mobile Doctors' branches, said that some branches, including the branch located in the **Subject Premises**, have used what Mobile Doctors calls "standing orders," which are forms that physicians sign that authorize non-physicians to order tests for the physicians. According to Individual LV, some physicians have refused to grant such authorizations, but others have done so, sometimes without knowing. For example, on or about February 6, 2013, the branch manager for the St. Louis, Missouri office wrote an email to AJIRI and others about how the branch manager had gotten a new physician to sign such a "standing order." According to the email, "I used the ol' Detroit tactic of getting standing orders in the initial paperwork process on [a new physician] and it went off without a hitch."

64

198.    In a January 21, 2013 email to AJIRI, the branch manager of Mobile Doctors'

Indianapolis office said that a physician was upset about such tests being ordered:

> He's [the doctor] upset about the ordering of tests (ultrasounds) on NPs [new patients] based off of diagnoses without the proper documentation in his SOAP ["Subjective Objective Assessment and Plan"] notes to back them.   He is certain he will lose his license for this and that Medicare 'can't possible (sic) approve' of this practice.   I shared the statistic you had in a recap response last week of $150 reimbursement for the test and $15,000 for the initial hospitalization due to a complication that could have been prevented if discovered on the baseline ultrasound.   He doesn't want to hear it or work with us on it.   He sounds just like [another physician] at this point.   So, he revoked his standing orders. ... My thought is to drown he (sic) and [the other physician] in charts every day so that they can see how much the CC's [clinical coordinators] do for them.

199.    In an email less than a week later, which was forwarded to AJIRI, the doctor

wrote that he was aware that tests were still being ordered that he did not believe were medically

necessary for those particular patients:

> I have had numerous conversations with assistant manager [Individual JG] and manager [Individual ND] of the Indianapolis branch asking them not to order tests under my name including echocardiograms and carotid Doppler's and EKGs that are not clinically indicated.   Despite my requests that these tests not be ordered under my name/NPI and billed to Medicare, non-clinical personnel in the office under the direction of [Individual JG] and [Individual ND] are continuing to order these tests.   I would ask that this practice stop IMMEDIATELY.   All clinical testing under my name and NPI must be ordered with my signature.

200.    Individual AT, a former assistant branch manager, said that she talked to AJIRI in

early 2012 about her concerns about Mobile Doctors ordering tests for patients who had been

recently discharged from a hospital.   According to Individual AT, Mobile Doctors ordered such

tests even when such tests had already been ordered by the physician treating the patient at the

hospital.   According to Individual AT, AJIRI initially responded that Mobile Doctors frequently

65

did not get test results. AJIRI also responded that testing was on the "list" of items that the government looks at, but said that that it was at the bottom of the list. Individual AT said that she understood AJIRI's response to indicate that ordering such tests was improper, though AJIRI believe that the practice would not attract scrutiny.

201. Individual AG, a former director of medical assistants in the Chicago branch, said that part of her job was to determine whether if there would be any profit left after comparing the cost of supplies for a test versus the reimbursement rates from Medicare. If there was any profit, the tests would always be ordered. According to Individual AG, the practice at Mobile Doctors often was to say that a patient had diabetes in order to justify ordering tests. According to Individual AG, on one occasion, AJIRI told her not to bother checking with a physician to clarify an unclear diagnosis, telling her, "Just give them a diagnosis. They won't investigate me over one test."

## VIII.   **THE SUBJECT PREMISES**

202. According to interviews with former and current employees, Mobile Doctors kept all patient records at its main office or one of its branch offices. As of July 2012, Mobile Doctors relocated its headquarters to 3319 N. Elston, Chicago (the **Subject Premises**). This address is listed as Mobile Doctors' headquarters on its website.

203. According to Individual LV, who currently manages the Chicago branch office and who contacted law enforcement herself, Mobile Doctors uses the entirety of the **Subject Premises**. According to her, Mobile Doctors' corporate offices, including AJIRI's office and Individual TC's office, are on the second floor, and the schedulers, clinical coordinators, and patient records are located on the first floor.

66

204. According to Individual SH, who is a current employee in Mobile Doctors' billing department, Mobile Doctors' billing department is located on the first floor of the **Subject Premises**. Mobile Doctors keeps yellow copies of the routing slips for approximately two weeks before shredding them. According to Individual SH, In Home Diagnostics' office is also located on the first floor of the **Subject Premises** and is accessible via the billing department.

205. According to interviews with employees, Mobile Doctors uses computers at each of its offices. Based on my training and experience, doctors' offices often maintain records related to patient files, billing, payroll and scheduling on computer systems located in the doctors' offices.

206. Investigating agents have conducted surveillance at the **Subject Premises** in Chicago, Illinois, on multiple occasions, including August 22, 2013, and have seen vehicles bearing the Mobile Doctors logo parked in a secure parking lot next to the building.

207. Based on my training and experience, as well as the evidence set forth above, the records to be seized in Attachment "B" are kept in the normal course of a health care provider's business at its home office, are likely to constitute evidence of the aforementioned violations, and are often kept on computers given the nature and volume of the records.

## IX.  SPECIFICS REGARDING SEARCHES OF COMPUTER SYSTEMS

208. Based upon my training and experience, and the training and experience of specially trained computer personnel whom I have consulted, searches of evidence from computers commonly require agents to download or copy information from the computers and their components, or remove most or all computer items (computer hardware, computer software, and computer-related documentation) to be processed later by a qualified computer

expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

c. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

209.     In addition, a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## X.     PROCEDURES TO BE FOLLOWED IN SEARCHING COMPUTERS

210.     The search and seizure warrant sought by this Application regarding the **Subject Premises** does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure.   Rather the warrant sought by this Application authorizes the removal of computers and related media so that they may be searched in a secure environment.

211.     With respect to the search of any computers or electronic storage devices seized from the location identified in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the

offenses specified above);

        c.     surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

        d.     opening or reading portions of files in order to determine whether their contents fall within the items to be seized as set forth herein;

        e.     scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

        f.     performing key word searches through all storage media to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B.

212.    Any computer systems and electronic storage devices removed from the premises during the search will be returned to the premises within a reasonable period of time not to exceed 30 days, or unless otherwise ordered by the Court.

## XI.    SEIZURE OF FUNDS

213.    According to a review of bank records, Mobile Doctors uses multiple bank accounts. According to a report reviewing Mobile Doctors' operations in connection with Mobile Doctors' application for a loan, Mobile Doctors uses Lake MI Mobile Doctors, Inc. as its "billing arm" and previously used Doctor Housecalls of MI the same way.

214.    According to a review of bank records and electronic funds agreements signed on behalf of Lake MI Mobile Doctors, payments are made by Medicare into an account at American

Chartered Bank in the name of Lake MI Mobile Doctors and ending with the digits 5740 ("**Company Account 5740**").

215.     According to a review of bank records, funds are regularly transferred from **Company Account 5740** to another account at American Chartered Bank in the name of Mobile Doctors U.S.A., LLC ending in the digits 9296 ("**Company Account 9296**").     According to business signature cards from 2011, DIKE AJIRI is the sole signatory for **Company Account 5740** and one of the two signatories for **Company Account 9296**.

216.     According to bank records, funds have been transferred from **Company Account 9296** to an account at Chase Bank in the name of DIKE AJIRI and his wife ending in the digits 1396 ("**AJIRI Account 1396**").     Based on a review of records for **AJIRI Account 1396**, approximately $4,165,102.65 was transferred from Mobile Doctors to **AJIRI Account 1396** from December 2008 to January 2013, including approximately $343,555.37 from September 1, 2012 to January 2013.     In total, approximately 77.97 percent of the money going into **AJIRI Account 1396** came from Mobile Doctors.[6]

217.     According to an analysis of claims data, Medicare has paid approximately $2,568,156.56 to Lake MI Mobile Doctors on claims submitted using CPT code 99350 with service dates between September 1, 2012 and July 31, 2013, as well as approximately $4,647,565.60 to Lake MI Mobile Doctors on claims submitted using CPT code 99349 during the same period.     As described above, funds from **Company Account 5740** are then transferred to **Company Account 9296**, and some funds have been transferred to **AJIRI Account 1396**.

---

[6]     Another $444,946.38 into **AJIRI Account 1396** came from In Home Diagnostics, representing another 7.95 percent of the total funds into **AJIRI Account** 1396.

218.    I am aware that Title 18, United States Code, Sections 981(a)(1)(C) and 981(b) authorize civil forfeiture of funds derived from proceeds traceable to a violation of Title 18, United States Code, Section 1347.    In particular, Title 18, United States Code, Section 981(a)(1)(C) authorizes the seizure of property which constitutes or is derived from proceeds traceable to various offenses, including "any act or activity constituting an offense involving a Federal health care offense," as specified in Title 18, United States Code, Section 1956(C)(7)(F).

219.    In this case, the deposits described above do not represent all of the activity in the **Subject Accounts**.    To some extent, the deposits have been commingled with other funds deposited and withdrawn from the **Subject Accounts** over time.    However, Title 18, United States Code, Section 984 permits the Government in a civil forfeiture action to forfeit fungible property, such as funds deposited in a bank account, without directly tracing the property if the funds are seized from the same account as the property involved in the offense, provided that the action is commenced within one year from the date of the offense.    Specifically, according to the statute:

        (a)(1)        In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or precious metals —

            (A)     it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and

            (B)     it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

        (2)        Except as provided in subsection (b), any identical property found in the same place or account as the property involved in the offense

72

that is the basis for the forfeiture shall be subject to forfeiture under this section.

(b)    No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense.

18 U.S.C. § 984(a)-(b).

220.    The Government anticipates that this seizure warrant will be signed on or before September 1, 2013. As such, the Government is limiting its request for authority to seize funds that equal the deposits resulting from the payments on the CPT code 99350 claims described above, which funds were placed into the **Subject Accounts** between on or about September 1, 2012 and the present date. These funds may be seized because they were deposited within the one-year period authorized by 18 U.S.C. § 984.

221.    Based on the foregoing, I believe that there is probable cause to seize for forfeiture a total of funds not exceeding $2,568,156.56, representing the proceeds from the submission of claims using CPT codes 99350, from **Company Account 5740**, **Company Account 9296**, and **AJIRI Account 1396**.

## XII.   <u>CONCLUSION</u>

222.    Based on the above information, I respectfully submit that there is probable cause to believe that:

a.    Beginning no later than 2007 and continuing until the present, DIKE AJIRI did knowingly and willfully participate in a scheme to defraud a health care benefit program, namely, Medicare, and to obtain money owned by and under the custody and control of Medicare by means of false and fraudulent pretenses, representations, and promises, in connection with the

73

delivery of and payment for health care benefits, items, and services, and, in execution of the scheme, on or about June 26, 2013, did knowingly submit and cause to be submitted a false claim, specifically, a claim that a May 24, 2013 visit by a Mobile Doctors physician with Patient LC was complicated in nature, in violation of Title 18, United States Code, Section 1347.

      b.     On or about June 27, 2012, BANIO KOROMA knowingly and willfully made a materially false, fictitious, and fraudulent statement and representation in a matter involving a health care benefit program in connection with the payment for home care benefits and services, namely, a statement that Patient SM was confined to her home and required home health services on a Home Health Certification and Plan of Care Form ordering such services for Patient SM from on or about June 13, 2012 through on or about August 11, 2012, in violation of Title 18, United States Code, Section 1035.

223.   I further submit that there is probable cause to believe that health care fraud offenses, in violation of Title 18, United States Code, Section 1347, have been committed, and that evidence of this criminal conduct, as further described in Attachment B, are located at the **Subject Premises**.   By this affidavit and application, I request that the Court issue a search warrant allowing agents to seize the evidence described in Attachment B of the respective application.   I further submit that proceeds of this criminal conduct are located in the **Subject Accounts**.   By this affidavit and application, I request that the Court issue seizure warrants allowing agents to seize funds not exceeding $2,568,156.56 from the **Subject Accounts**.

FURTHER AFFIANT SAYETH NOT.

_____
Raul Sese
Special Agent
Department of Health and Human Services

Subscribed and sworn
before me this 26th day of August, 2013

_____
Honorable Mary M. Rowland
United States Magistrate Judge

75

**ATTACHMENT A**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The **Subject Premises** is the two-story brick commercial building located at building located at 3319 N. Elston Avenue in Chicago, Illinois, near the intersection of Elston Avenue and Henderson Street. The building is cream / light-colored. At the northwest corner of this intersection is a parking lot for Mobile Doctors, and the subject premises are immediately adjacent (northwest) of this parking lot. The letters and numbers, "3319 N. Elston," are affixed to the glass at the front entrance of the building. This entrance and signage face Elston Avenue. Mobile Doctors occupies this entire light-colored building.

The first floor of the **Subject Premises** contains the office for the Chicago branch of Mobile Doctors, the office for In Home Diagnostics (also known as Ultrasound2You), and Mobile Doctors' billing department, which handles billing for Mobile Doctors and In Home Diagnostics. All three areas are accessed through a common front door. From this common area, doors lead to the billing department and to the Chicago branch office. The billing department contains a direct entrance to the office of In Home Diagnostics.

The second floor of the **Subject Premises** contains the corporate offices for Mobile Doctors, including the offices of DIKE AJIRI.

Photographs of the outside of the **Subject Premises**, particularly the front door displaying the Mobile Doctors sign, are below:

76



Exterior of **Subject Premises**



Close-up of front door of
**Subject Premises**

## ATTACHMENT B

Evidence and instrumentalities concerning violations of Title 42, United States Code, Section 1320a-7b, and Title 18, United States Code, Sections 371 and 1347, in any form or container, including electronic or digital files residing on computers and other data storage devices, for the period 2006 to the present, as follows:

1. Patient medical records, including those related to patient visits, certifications for home health services, the supervision of home health services, and communications with home health agencies about patients' care.

2. Policies, procedures and protocols pertaining to billing, tests, and patient care.

3. Items pertaining to the scheduling of and duration of patient visits by Mobile Doctors and In Home Diagnostics employees, including schedules and travel logs.

4. Items relating to duties performed by physicians and medical assistants at Mobile Doctors, including time sheets, sign-in sheets, notes, reports, minutes, calendars, appointment books, logs, and "standing orders."

5. Items relating to Mobile Doctors' relationships with home health agencies, including correspondence, agreements, and referral tracking logs.

6. Analyses of patient admissions and tracking of patient referrals to Mobile Doctors by source of referral, including admissions logs, patient referral/admission face sheets, summaries, spreadsheets, ledgers, accounting books and records, and any related notes and correspondence.

7. Items relating to Medicare payments received by or on behalf of Mobile Doctors, including any related entity, for claims submitted on behalf of Mobile Doctors

78

physicians, including reports, summaries, analyses, and Explanation of Benefit forms.

8. Items related to payments to or compensation received by DIKE AJIRI from Mobile Doctors, including checks, wire transfer records, and bank records.

9. Items related to accounts at banks or other financial institutions in the name of or on behalf of DIKE AJIRI, any of his family members, and/or any entities controlled by or on behalf of DIKE AJIRI and/or any family members.

10. Bulletins, manuals, guidance, publications from, and any correspondence with Medicare or any of its contractors, including Wisconsin Physician Services and Trust Solutions.

11. Documents related to any inspection, investigation, or survey by the Centers for Medicare and Medicaid Services, or any federal or state agency related to health care services provided by Mobile Doctors.

12. Training materials, literature, articles, guidance, or communications regarding billing, coding, and the ordering of tests.

13. Training materials, literature, articles, guidance, or communications regarding federal anti-kickback and health care fraud laws and the Stark Act.

14. Personnel files for all current and former physicians, all current and former branch managers, all current and former directors of quality assurance, all current and former clinical coordinators, all current and former members of the billing department, all current and former directors of quality assurance, and all current and former employees in Mobile Doctors' corporate office, including contracts between employees and Mobile Doctors, terms of compensation, performance reviews, and disciplinary

records.

15. Financial records relating to Mobile Doctors, including general ledgers, accounting books and records, balance sheets, financial statements, bank statements, bank books, checkbooks, checks, check requests, expense reports, certificates of deposit, brokerage and investment account records, stock certificates, credit cards and credit card statements, tax returns, tax return information, property appraisal, mortgage and title documents, as well as any safe deposit box keys and storage facility keys.

16. Documents related to record retention policies for patient medical records and other records of Mobile Doctors, including the locations for on-site and off-site storage of documents.

Items in the paragraphs above that are stored in computer media, including media capable of being read by a computer (such as external and internal computer hard drives, servers, memory sticks, and thumb drives), shall be searched in accordance with the attached Addendum.

## ADDENDUM TO ATTACHMENT B

This warrant does not authorize the "seizure" of computers and related media within the meaning of Rule 41(c) of the Federal Rules of Criminal Procedure.   Rather this warrant authorizes the removal of computers and related media so that they may be searched in a secure environment. The search shall be conducted pursuant to the following protocol:

With respect to the search of any computers or electronic storage devices removed from the premises described in Attachment A hereto, the search procedure of electronic data contained in any such computer may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.      examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth herein;

b.      searching for and attempting to recover any deleted, hidden, or  encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying various file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth herein;

d.      opening or reading portions of files in order to determine whether their contents fall

81

within the items to be seized as set forth herein;

      e.      scanning storage areas to discover data falling within the list of items to be seized as set forth herein, to possibly recover any such recently deleted data, and to search for and recover deliberately hidden files falling within the list of items to be seized; and/or

      f.      performing key word searches through all electronic storage media to determine whether occurrences of language contained in such storage media exist that are likely to appear in the evidence described in Attachment B.

The government will return any computers or electronic storage devices removed from the premises described in Attachment A hereto within 30 days of the removal thereof, unless contraband is found on the removed computer and/or electronic storage device, or unless otherwise ordered by the Court.